Kenneth J. WILSON, Plaintiff–Appellee,

v.

RUFFA & HANOVER, P.C., Defendant–Appellant.

No. 357, Docket 87–7357.

United States Court of Appeals, Second Circuit.

Argued Nov. 25, 1987.

Decided April 12, 1988.

Timothy P. Butler, New York City (Robert E. Meshel, D'Amato & Lynch, New York City, of counsel), for defendant-appellant.

Jonathan B. Altschuler, New York City, for plaintiff-appellee.

Before TIMBERS, WINTER and MAHONEY, Circuit Judges.

WINTER, Circuit Judge:

This appeal presents the question whether proof of loss causation is an essential element of an action under Section 12(2) of the Securities Act of 1933, 15 U.S.C. § 77*l* (1982), when the defendant is a collateral participant in a securities transaction and not an actual seller. The law firm Ruffa & Hanover appeals from a judgment, entered after a trial before Judge Sprizzo, holding it liable under Section 12(2) for having prepared and distributed a private-placement memorandum in connection with a private offering conducted by one of the firm's clients. The private-placement memorandum misstated a material fact. The district court held that plaintiff was not required to prove loss causation—in other words, that the material misstatement pertained to the ultimate cause of his damages—in order to recover against Ruffa & Hanover. We disagree and accordingly reverse.

## BACKGROUND

In March 1981, plaintiff Kenneth J. Wilson was solicited to invest in the stock of Saintine Exploration and Drilling Corp., a newly formed contract driller of oil and gas wells. Fred Rodolfy, a principal shareholder of the company and chairman of its board of directors, told Wilson that Saintine was going to drill for oil in Honduras and would make a good investment. In early April, Ruffa & Hanover, Saintine's counsel, sent Wilson a "Confidential Private Placement Memorandum" and a "Subscription Package" for the private offering of 1,000,000 shares of Saintine's common stock. Ruffa & Hanover had prepared the memorandum and the other documents relating to Saintine's offering, and had forwarded these materials to Wilson at the request of Rodolfy and Robert D.P. Welch, Saintine's president. In mid-April, Wilson received a revised version of the private-placement memorandum, also prepared by Ruffa & Hanover.

The private-placement memorandum explained that Saintine had been formed in part for the purpose of participating in a joint venture to explore for and to develop petroleum products under certain concessions granted by the government of Honduras. In addition, the memorandum stated that:

> The Company *has* contracted for the purchase from Centurion Oil & Minerals Company ("Centurion"), a Texas corporation, of Centurion's rights, pursuant to joint venture arrangements between Centurion, Petroleos Yojoa, S.A., a Honduras corporation ("Peysa"), Compania Explorada, S.A., a Honduras corporation ("Coexsa"), and Compass Corporation, a Texas corporation ("Compass"), regarding the exploration for and development of the oil and gas resources contained in certain tracts of land located in the Republic of Honduras (the "Honduran Concessions"). Approximately 114,988 acres are the subject of the Republic of Honduran government concessions granted by Peysa. Coexsa has applied to the Minister of Natural Resources of the Republic of Honduras for a concession covering 59,280 additional acres. The agreement between Centurion and Saintine *provides* that Centurion will also assign to Saintine its rights with respect to concessions granted to Saintine by the Honduran government.

\*     \*     \*     \*     \*     \*

Saintine *agreed* to purchase Centurion's interest in the venture and, accordingly, in its interest in production from the Concession, for $200,000. The terms of the agreement also *provides* [sic] that Centurion will retain a 4% working interest in production obtained from wells drilled on the Concessions by Saintine and that in the event that Saintine shall acquire any further concessions to explore and develop properties in Honduras, Saintine shall grant to Centurion a 1% overriding royalty in production from such additional concessions. The closing of the agreement between Centurion and Saintine is scheduled to take place on or about June 30, 1981.

(emphasis added). The district court found, however, that Centurion and Saintine did not enter into an agreement with respect to the Honduran concessions until May 27, 1981, and accordingly that the April private-placement memorandum had falsely stated that the firms had reached such an agreement at that time. Specifically, the court found "incredible," in light of contrary documentary evidence, the testimony of William P. Ruffa (of Ruffa & Hanover) that an oral agreement had in fact been reached at the time the private-placement memorandum was issued.

On May 28, 1981, after receiving the private-placement memorandum and offering documents but before Saintine actually finalized the contractual arrangements described above, Wilson purchased 90,000 shares of Saintine common stock for $36,000. Although the false statement about the contractual arrangements was cured after Wilson's purchase, Saintine never engaged in any drilling in Honduras. In early 1982, Rodolfy telephoned Wilson to tell him that "[y]ou can expect a call from Mr. Welch, offering you your money back." According to Wilson, Rodolfy "said that they had done something wrong, or that the concession was wrong, something of that sort.... And I said, fine, I would be happy to have my money back." Soon thereafter, Welch refunded only $5,000 of Wilson's investment with the vague expla-

nation that "[w]e are somewhat disappointed on the sale of an asset for Saintine Exploration & Drilling Corporation." Welch nevertheless promised that the remaining $31,000 would be refunded within ninety days.

The refund never arrived, however, prompting Wilson to bring this suit against, among others, Saintine, Welch's estate, Rodolfy and Ruffa & Hanover. Wilson alleged that the defendants had violated Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) (1982), Rule 10b–5 thereunder, 17 C.F.R. § 240.10b–5 (1987), and Section 12(2) of the '33 Act. Wilson's Section 10(b) claim against Ruffa & Hanover was dismissed before trial under Fed.R.Civ.P. 9(b) for failure to plead fraud with particularity. After a one-day bench trial, Judge Sprizzo entered judgment against Welch's estate, which defaulted, and against Rodolfy and Ruffa & Hanover. The court awarded plaintiff $47,513.40 in damages, including prejudgment interest.

The district court found that the defendants knew that the statement in the private-placement memorandum was false. As to Ruffa & Hanover, the district court held that, even though the law firm was not actually a seller of securities,

> the evidence clearly establishes the type of material participation which the case law would find sufficient [to support liability]. They prepared the offering statement, they participated extensively [in] preparing the contents of that statement, they knew it was being sent to the offeror, indeed they sent the first offering statement to Wilson.

The court also rejected Ruffa & Hanover's contention that plaintiff should have been required to prove loss causation, stating that "th[e] material omission is not cured by the fact that, as defendants argue[,] ... the plaintiff was damaged by Welch's running away with the money rather than by their false statements ... in the offering statement." This appeal followed.[1]

---

**1.** Rodolfy also appealed, *pro se.* Since he is liable as a controlling person under Section 15

of the '33 Act, 15 U.S.C. § 77o (1982), we have

## DISCUSSION

The Securities Act of 1933 and the Securities Exchange Act of 1934 provide a number of private rights of action imposing liability upon certain parties in particular kinds of securities transactions. *See, e.g.,* Securities Act of 1933, § 11, 15 U.S.C. § 77k (1982) (liability upon issuer, officers and directors of issuers, and signatories, for misstatements and omissions in registration statements); *id.* § 12(1), 15 U.S.C. § 77*l*(1) (1982) (liability upon offerors and sellers of unregistered securities); *id.* § 15, 15 U.S.C. § 77*o* (1982) (liability of persons who control persons liable under Sections 11 and 12); Securities Exchange Act of 1934, § 9(e), 15 U.S.C. § 78i(e) (1982) (liability for various acts of market manipulation); *id.* § 18, 15 U.S.C. § 78r (1982) (liability for false and misleading statements in documents filed with SEC). All of these provisions carefully distinguish among various actors, the standards of conduct applicable to each, the measure of available damages, and the procedural hurdles plaintiffs must clear to succeed on their claims. The provision at issue in this case, Section 12(2) of the '33 Act, provides that

[a]ny person who ... offers or sells a security ... by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading (the purchaser not knowing of such untruth or omission), and who shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of such untruth or omission, shall be liable to the person purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security.

affirmed the judgment against him by summary

15 U.S.C. § 77*l*(2). Section 12(2) thus provides for liability in favor of *purchasers* of securities against *offerors* or *sellers* who negligently make misleading statements or omissions, without regard to whether the purchaser actually relied upon the misleading communication. *See, e.g., Akerman v. Oryx Communications, Inc.,* 810 F.2d 336, 344 (2d Cir.1987); *Sanders v. John Nuveen & Co.,* 619 F.2d 1222, 1225 (7th Cir.1980), *cert. denied,* 450 U.S. 1005, 101 S.Ct. 1719, 68 L.Ed.2d 210 (1981). It also provides the remedy of rescission to a purchaser who continues to hold the security and thus compensates for all losses, whether or not caused by the misstatement.

Because the language of Section 12(2) applies only to offerors and sellers of securities (although persons controlling such offerors and sellers may be liable through Section 15), some courts have taken the view that privity between the plaintiff and defendant must be shown. *See, e.g., Barker v. Henderson, Franklin, Starnes & Holt,* 797 F.2d 490, 494 (7th Cir.1986) (dicta); *Collins v. Signetics Corp.,* 605 F.2d 110, 113 (3d Cir.1979) ("This section is designed as a vehicle for a purchaser to claim against his immediate seller. Any broader interpretation would not only torture the plain meaning of the statutory language but would frustrate the statutory schema...."); *see also Harrison v. Enventure Capital Group, Inc.,* 666 F.Supp. 473, 475–76 (W.D.N.Y.1987) (criticizing and declining to follow contrary Second Circuit precedent in view of Supreme Court's restrictive approach to implied rights of action). Other courts, including ours, have held that under some circumstances persons other than actual sellers may be held liable under Section 12(2). Of these courts, the majority have expansively interpreted the term "seller." For example, the Fifth and Eleventh Circuits have held that a seller under Section 12 includes persons who "proximately caused" a securities transaction, *Croy v. Campbell,* 624 F.2d 709, 713 (5th Cir.1980), or even "those whose participation in the buy-sell transaction is a substantial factor in causing the transaction to

order dated today.

take place." *Foster v. Jesup & Lamont Secs. Co.,* 759 F.2d 838, 844 (11th Cir.1985) (quoting *Pharo v. Smith,* 621 F.2d 656, 667 (5th Cir.1980)).

We have taken a different approach, and have somewhat imprecisely held that a person who makes a misrepresentation, but who "is not the immediate and direct seller of the securities," may nevertheless be held liable under Section 12(2) "as a participant, aider and abettor, or coconspirator." *Mayer v. Oil Field Sys. Corp.,* 803 F.2d 749, 756 (2d Cir.1986). However, we have also recognized that because Section 12(2) applies to all sales of securities, application to nonselling collateral participants of the full liability of sellers under Section 12(2) would vastly expand liability under the securities laws. Accordingly, we have held that Section 12(2) requires a showing of "privity or, in the absence of privity, scienter." *Lanza v. Drexel & Co.,* 479 F.2d 1277, 1298 (2d Cir.1973) (in banc) (footnote omitted). As under Section 10(b), proof of scienter requires that the plaintiff "demonstrate 'knowing or intentional misconduct' on the part of the defendant, or an 'intent to deceive, manipulate, or defraud' investors." *Wechsler v. Steinberg,* 733 F.2d 1054, 1058 (2d Cir.1984) (quoting *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 197, 193, 96 S.Ct. 1375, 1382, 1380, 47 L.Ed.2d 668 (1976)), *cited in Mayer,* 803 F.2d at 756.

■ On appeal, Ruffa & Hanover does not dispute the district court's finding that it acted with scienter in preparing and distributing the private-placement memorandum. Rather, the law firm contends that the district court erred in holding that loss causation was not an element of a Section 12(2) claim against a nonselling collateral participant in a securities transaction.[2] Loss causation, of course, could not be proven here because the Honduran concession agreement was in fact executed on May 27, 1981—one day before Wilson purchased his stock and one month before, according to the private-placement memorandum, the closing was to take place. We agree that plaintiff's inability to prove loss

causation is fatal to his claim under Section 12(2).

The Supreme Court has repeatedly emphasized that respect for the interdependence of the various provisions of the securities laws must play a central role in their interpretation. In *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed. 2d 668 (1976), for example, which held that scienter was a required element of an action under Section 10(b), the Court relied in part upon the need to avoid "nullify[ing] the effectiveness of the carefully drawn procedural restrictions on [the] express actions" authorized by Sections 11, 12(2) and 15 of the '33 Act. *Id.* at 210, 96 S.Ct. at 1389. By the same token, just as "[a] court must take care lest the implied right of action under [Section 10(b)] unravel the presumptions and defenses created by Congress," *Barker,* 797 F.2d at 495, we must take care to avoid reading the more particularized rights of action so expansively as to undo the restrictions that have been imposed by the courts upon Section 10(b). Section 10(b) was designed by Congress to be the "catchall" provision filling the interstices between other private rights of action, *see Hearings on H.R. 7852 and H.R. 8720 Before the House Comm. on Interstate and Foreign Commerce,* 73d Cong., 2d Sess. 115 (1934) (remarks of Senator Corcoran), *quoted in Hochfelder,* 425 U.S. at 202, 96 S.Ct. at 1385, and interpretation of those other actions must respect the contours of Section 10(b) lest they, by expansive interpretation, become "catch-alls."

We have long held that, in suits brought under Section 10(b) and Rule 10b-5, "the plaintiff must show both *loss causation* —that the misrepresentations or omissions caused the economic harm—and transaction causation—that the violation in question caused the [plaintiff] to engage in the transaction in question." *Bennett v. United States Trust Co.,* 770 F.2d 308, 313 (2d Cir.1985), *cert. denied,* 474 U.S. 1058, 106 S.Ct. 800, 88 L.Ed.2d 776 (1986) (quoting *Schlick v. Penn–Dixie Cement Corp.,* 507 F.2d 374, 380 (2d Cir.1974), *cert. denied,* 421 U.S. 976, 95 S.Ct. 1976, 44 L.Ed.2d 467

---

**2.** The parties agree that plaintiff was not in    privity with Ruffa & Hanover.

(1975)). Transaction causation, of course, is simply reliance, *see Schlick*, 507 F.2d at 380, and, in the case of misstatements, is established by allegations and proof that the transaction in question would not have occurred "but for" the misstatement. *See Chemical Bank v. Arthur Andersen & Co.*, 726 F.2d 930, 943 & n. 23 (2d Cir.), *cert. denied*, 469 U.S. 884, 105 S.Ct. 253, 83 L.Ed.2d 190 (1984). Loss causation, on the other hand, requires a "direct or proximate relationship between the loss and the misrepresentation," *Bennett*, 770 F.2d at 314, and "may not be supplied by 'but for' allegations." *Bloor v. Carro, Spanbock, Londin, Rodman & Fass*, 754 F.2d 57, 61 (2d Cir.1985) (citing *Chemical Bank*, 726 F.2d at 943).

■ We believe that a Section 12(2) action against nonselling collateral participants such as Ruffa & Hanover requires proof of both loss causation and transaction causation. To hold otherwise would effectively nullify the important requirement that both these elements be proven in Section 10(b) actions, and many suits against nonsellers that would fail under Section 10(b) would succeed under Section 12(2). Section 12(2) would then supplant Section 10(b) as the "catch-all clause to prevent manipulative devices." *Hearings on H.R. 7852 and H.R. 8720 Before the House Comm. on Interstate and Foreign Commerce*, 73d Cong., 2d Sess. 115 (1934) (remarks of Senator Corcoran), *quoted in Hochfelder*, 425 U.S. at 202, 96 S.Ct. at 1385. This would constitute a result of no small significance, given the tendency of sellers to disappear into either Chapter 11 or the Cayman Islands, and "the practice of plaintiff's counsel in suing everyone, no matter how remotely connected with the transaction, who might have the ability to pay the judgment." R. Jennings & H. Marsh, *Securities Regulation* 1134 (5th ed. 1982).

We do not mean to suggest, of course, that plaintiffs must demonstrate loss causation or transaction causation in suits against actual sellers or those who control them. In drafting Section 12(2), Congress obviously sought to provide a heightened deterrent against *sellers* who make misrepresentations, by rendering tainted transactions voidable at the option of the defrauded purchaser regardless of whether the loss is due to the fraud or to a general market decline. Yet this heightened deterrent is expressly directed only at actual sellers and those who control them. We recognized this fact when, in extending the scope of Section 12(2) beyond its plain terms to collateral participants, we required that scienter must be proven as to them although a showing of negligence would suffice as to sellers. *Lanza v. Drexel & Co.*, 479 F.2d at 1298. For similar reasons, we believe that a showing of loss causation is necessary to hold collateral participants liable under Section 12(2). We recognize that our holding renders actions against collateral participants under Section 12(2) essentially identical to actions under the "catch-all" Section 10(b). That is not an anomalous result, however, in light of the cumulative nature of the remedies under the 1933 and 1934 Acts. *See Herman & MacLean v. Huddleston*, 459 U.S. 375, 383–87, 103 S.Ct. 683, 687–89, 74 L.Ed.2d 548 (1983).

Reversed.

TIMBERS, Circuit Judge, dissenting:

I regret that I am unable to join in Judge Winter's innovative majority opinion. I am unable to do so because holding that proof of loss causation is a requisite element of an action under § 12(2) of the Securities Act of 1933 is contrary to the language of the statute, legislative intent, and relevant precedent, including prior decisions of our Court.

The language of the statute itself, which imposes liability for a material misrepresentation "by means of" a prospectus or oral communication, argues against a requirement of causation. After stating that a buyer suing under § 12(2) does not have to prove reliance, Professor Louis Loss, the nation's leading commentator on securities law, observed:

"Inevitably, ... some element of reliance (which is subjective) is inherent in the concept of materiality (which is an

objective, 'reasonably prudent person' concept). But, especially since Congress left § 12(2) alone when it amended § 11 in 1934 to require proof of reliance in some circumstances, that element should not be permitted to come in the back door by way of a definition of materiality.

This legislative history also argues against reading something like a reliance (or *causation* ) requirement into the statutory reference to a sale 'by means of' a misleading prospectus or oral communication." (emphasis added).

Loss, Fundamentals of Securities Regulation 890 (1988) (footnote omitted).

Professor Loss also has pointed out that "[r]ecission and § 12(2) are *substantially the same* " (emphasis in original), *id.* at 888, and "[t]he elements of recission, in a nutshell, are 'misrepresentation' of a 'material' 'fact' on which the buyer justifiably 'relied.' *The buyer need not show any causal connection between the misrepresentation and his damage; indeed, he need not even show that he has been damaged.*" *Id.* at 873 (emphasis added).

In the seminal case of *Hill York Corp. v. American International Franchises, Inc.,* 448 F.2d 680, 696 (5 Cir.1971) (Clark, J.) (citations omitted), the Fifth Circuit stated, in construing § 12(2), that when determining the materiality of the omission

"[o]ne note of caution should be sounded here. A *causation* test should *not* be read into this Section. A plaintiff does not have to prove that the sale would not have occurred absent the misrepresentation or omission." (emphasis added).

*See also Sanders v. John Nuveen & Co.,* 619 F.2d 1222, 1225 (7 Cir.1980), *cert. denied,* 450 U.S. 1005 (1981); *Gilbert v. Nixon,* 429 F.2d 348, 356 (10 Cir.1970); *Klein v. Computer Devices, Inc.,* 591 F.Supp. 270, 277 (S.D.N.Y.1984), *reargument on other grounds,* 602 F.Supp. 837 (S.D.N.Y. 1985).

The statement quoted above from *Hill York Corp.* is in accord with the law of this Circuit which has cited *Hill York Corp.* with approval. *Jackson v. Oppenheim,* 533 F.2d 826, 829 (2 Cir.1976) (Oakes, J.).

In *Jackson,* we stated that, to recover under § 12(2), a buyer of stock need not prove that the alleged "misleading nature" of the communication to him "caused" the eventual purchase. *Id.* In accordance with the language of § 12(2), we further stated that the buyer does have to prove that the challenged sale was effected "by means of" the communication viewed as a whole. *Id.* We went on to explain that this is to say that "the communication as a whole must have been instrumental in the sale of ... [the] shares of ... stock." *Id.* at 829–30. Although a buyer need not show that the alleged misleading communication had a "decisive effect" on his decision to buy, he must show that it at least stands in *"some causal relationship"* to that decision. *Id.* at 830 (emphasis added). It is clear from our discussion, however, that proof of a "causal relationship" is a less stringent requirement than proof of "causation". We also expressly stated that we were not refuting those courts which held that reliance need not be proven by plaintiffs in § 12(2) actions. *Id.* at 830 n. 8; *see also Akerman v. Oryx Communications, Inc.,* 810 F.2d 336, 344 (2 Cir.1987) (Meskill, J.) (§ 12(2) imposes liability regardless of reliance by purchaser); *Wigand v. Flo–Tek, Inc.,* 609 F.2d 1028, 1034 (2 Cir.1979, as amended 1980) (Lumbard, J.) (absent allegation by seller that buyer of stock knew of falsity of misrepresentations, buyer not required to show reliance on misrepresentation to recover under § 12(2)).

Furthermore, at issue in *Jackson* was a misleading oral communication, as compared to the misleading private placement memorandum at issue in the instant case. After stating that some proof of a causal relationship is necessary, we stated in a footnote that

"The situation is entirely different, of course, where liability is based on a misleading prospectus constituting an offer of sale. In such cases liability may be based on the misleading 'offer' by prospectus even though the prospectus is mailed after the confirmation of the sale."

*Jackson, supra,* 533 F.2d at 830 n. 10. Thus, in the instant case, an even lesser standard than "causal relationship" applies.

As the majority points out, we have expanded liability under § 12(2) beyond the immediate and direct seller of the securities. *Mayer v. Oil Field Sys. Corp.,* 803 F.2d 749, 756 (2 Cir.1986); *Lanza v. Drexel & Co.,* 479 F.2d 1277, 1298 (2 Cir.1973) (en banc). Before holding a "participant, aider and abettor, or coconspirator" liable under § 12(2), however, a plaintiff is required to show "privity or, in the absence of privity, scienter." *Lanza, supra,* 479 F.2d at 1298. As the majority recognizes, some other circuits also have accepted a broader definition of "seller" under various circumstances. There is no mention of an additional requirement of proof of loss causation in any of these cases. Indeed, no court, so far as I know, has held as the majority does today, that loss causation is a requisite element of a § 12(2) action.

We have rejected an attempt to apply a standard used in § 10(b) cases to a § 12(2) case. We held that, although an intent to defraud criterion is required by § 10(b) and Rule 10b-5, "[w]e do not understand ... why the latter standard should be applied to § 12(2)." *Franklin Sav. Bank of New York v. Levy,* 551 F.2d 521, 526-27 (2 Cir. 1977) (Mulligan, J.). I believe that the majority's decision to impose proof of loss causation, a necessary element of a § 10(b) claim, on a § 12(2) claim is wholly unwarranted.

Underlying the majority's decision appears to be dissatisfaction with our prior decisions to permit expanded liability under § 12(2) when certain conditions are met.

---

**1.** There are two housekeeping matters that I am constrained to mention.

First, before a holding of first impression such as this by the majority goes in the books, I should have thought that the Securities and Exchange Commission would have been invited to file an *amicus* brief. After all, the Commission has had more than a half century of administering the 1933 Act (ever since that responsibility was transferred to the SEC from the FTC by the 1934 Act) and presumably has some expertise that we should not foreclose ourselves from obtaining.

Yet, at this late date—more than half a century after enactment of both the 1933 Act and the 1934 Act—I do not believe that we should engraft the elements of a 1934 Act § 10(b) claim on a 1933 Act § 12(2) claim, particularly when doing so not only misconstrues the plain language of the statute and legislative intent, but requires us to overrule our own precedents.

If such a drastic change in this remedial statute is to be made, it should be done by Congress, not by our Court. *See* Loss, Fundamentals of Securities Regulation, *supra,* at 890.[1]

I would affirm the judgment entered on Judge Sprizzo's well reasoned district court decision. From the majority's refusal to do so, I respectfully but emphatically dissent.

---

Second, under all the circumstances, I should have thought this an appropriate case in which to request an en banc poll *before* filing the opinion. It is undeniably a case of great importance (whose radiations will have an impact beyond our Circuit) and it conflicts with prior decisions of our Court. I am mindful that I have no role in requesting en banc consideration at this stage of the case, and that en banc prior to the panel decision is unusual. But this is a most unusual case.