**LITTON INDUSTRIES, INC., Plaintiff–Appellant–Cross–Appellee,**

v.

**LEHMAN BROTHERS KUHN LOEB INCORPORATED, Defendant–Appellee–Cross–Appellant,**

Dennis Levine; Ira B. Sokolow; Robert M. Wilkis; Bank Leu International, Ltd.; Bank Leu A.G.; John R. Lademann; Bruno Pletscher; Jean–Pierre Fraysse; Christian Schlatter, Defendants–Appellees,

**Bernhard Meier, Defendant.**

Nos. 464, 589, Dockets 91–7643, 91–7697.

United States Court of Appeals, Second Circuit.

Argued Nov. 21, 1991.

Decided June 17, 1992.

As Amended Sept. 23, 1992.

David H. Pittinsky, Philadelphia, Pa. (Lawrence D. Berger, Scott R. Shepherd, Thomas E. Groshens, Ballard, Spahr, Andrews & Ingersoll, Bruce W. Kauffman, Mark J. Levin, Dilworth, Paxson, Kalish & Kauffman, Philadelphia, Pa., Richard J. Mathieu, Burns, Kennedy, Schilling & O'Shea, New York City, of counsel), for plaintiff-appellant-cross-appellee.

Henry A. Hubschman,* Washington, D.C. (David M. Miles, Joseph C. Port, Jr., Nina Morais, Robert M. Fisher, Fried, Frank, Harris, Shriver & Jacobson, Washington, D.C.), for defendants-appellees Bank Leu A.G., Bank Leu Intern., Ltd., John R. Lademann, Bruno Pletscher, Christian Schlatter.

Arthur L. Liman, Martin Flumenbaum, Brad S. Karp, Talitha Curtis, Paul, Weiss, Rifkind, Wharton & Garrison, New York City, for defendant-appellee Dennis B. Levine.

Elliot Lauer, Benard V. Preziosi, Jr., Curtis, Mallet-Prevost, Colt & Mosle, New York City, for defendant-appellee Ira B. Sokolow.

Robert M. Wilkis, pro se.

David E. Weisberg, Weisberg & Berns, New York City, for defendant-appellee Jean-Pierre Fraysse.

Jeanne M. Luboja, New York City (Jonathan D. Bassett, Mitchel H. Ochs, Willkie Farr & Gallagher, of counsel), for defendant-appellee-cross-appellant Lehman Bros. Kuhn Loeb Inc.

Before: OAKES, Chief Judge, MESKILL and KEARSE, Circuit Judges.

OAKES, Chief Judge:

This litigation presents the question whether an acquiring corporation may hold its investment banker, employees of the banker, and their tippees liable—pursuant to rule 10b–5, civil RICO, or common law fraud—for insider trading in the stock of the target company based on information misappropriated from the acquiring corporation. The particular issue spotlighted on this appeal concerns causation.

Litton Industries, Inc. ("Litton") alleges that the price it paid for the acquisition of Itek Corporation was artificially inflated as a result of insider trading in Itek's common stock. In 1982, Litton decided to acquire Itek and retained Lehman Brothers Kuhn Loeb Inc. ("Lehman") (now Shearson Lehman Brothers) to serve as its investment banker. Information concerning Litton's plans was passed by an employee of Lehman to another employee of Lehman—Dennis Levine—who, unbeknownst to Litton, began purchasing massive amounts of Itek stock. Litton alleges that Levine's spree, as well as the purchases by traders either tipped by Levine or piggybacking on his trades, inflated the market price of Itek stock, forcing Litton to raise its tender offer for the outstanding Itek stock. Litton seeks damages based on overpayment for its tender offer purchases of Itek stock.

The third amended complaint names as defendants Lehman, Bank Leu International ("BLI"), and Bank Leu, as well as the traders—Levine, Ira Sokolow, Robert Wilkis, and various employees of BLI and Bank Leu. The complaint alleges the following causes of action: (1) violation of section 10(b) of the Securities Exchange Act of 1934 ("1934 Act"), 15 U.S.C. § 78j(b) (1988), and rule 10b–5, 17 C.F.R. § 240.10b–5 (1991); (2) civil RICO, 18 U.S.C. §§ 1962(a)–(d) & 1964(c) (1988); and (3) state common law claims, including fraud, negligence, interference with contractual relations, breach of contract, and breach of fiduciary duty. Lehman is not named as a defendant in the RICO and common law fraud counts, but is named in the securities fraud claim as a controlling person, pursuant to 15 U.S.C. § 78t(a) (1988), and in the negligence claim.[1] The United States District Court

---

* Subsequent to argument Mr. Hubschman withdrew.

1. Lehman was also a cross-appellant on the issue of the appropriateness of certification under

for the Southern District of New York, John M. Cannella, *Judge*, in orders dated March 27, 1989, reported at 709 F.Supp. 438, and August 4, 1989, granted appellees' motion for partial summary judgment dismissing all of Litton's claims for tender offer overpayment[2] on the grounds that the insider trading, as a matter of law, did not cause the injury alleged by Litton. Litton appeals from a judgment dated June 26, 1991, which, pursuant to a memorandum and order dated June 4, 1991, 767 F.Supp. 1220, directed the entry of final judgment under Fed.R.Civ.P. 54(b) on the dismissal of Litton's tender offer claims. We reverse the district court's dismissal, holding that there is a genuine issue of material fact concerning whether the trader appellees, trading on the basis of confidential information belonging to Litton, caused Litton's injury.

I

In 1982, Litton decided to expand its defense electronics business by acquiring a firm with an expertise in electronic warfare products. Litton retained Lehman, an investment firm known for its defense industry savvy, to aid in its search for a suitable acquisition. On September 20, 1982, Lehman gave a presentation to Litton, which assessed the merits of various defense electronics companies as potential targets and addressed the optimum strategies for acquiring such a company. Itek was among the companies highlighted by Lehman.

As a step toward possible acquisition of Itek, Litton began, in October 1982, to make open market purchases of Itek stock. In November, Litton settled on Itek as its target company. Litton informed Lehman, on November 8, 1982, that it wished to engage Lehman as the investment banker for the Itek transaction. At this time Itek stock was selling for approximately $26 per share. Acting on Lehman's advice, Litton commenced its acquisition strategy: to purchase 4.9% of Itek stock on the open market and to negotiate a friendly acquisition of Itek through a tender offer followed by a merger of Itek with a Litton subsidiary. On November 12, 1982, Lehman confirmed in writing the agreement between Litton and Lehman and the letter agreement was executed by Litton on November 23.

Ira Sokolow, who was among the Lehman employees privy to Litton's plans, passed information as to Litton's plans to Levine with the understanding that Levine would secretly purchase Itek stock and Sokolow would share in the profits derived from these purchases. On November 12, 1982, Levine instructed Bernhard Meier in the Bahamian office of BLI to purchase 50,000 shares of Itek common stock on Levine's behalf. On the basis of Levine's purchases, Meier and other employees of

Fed.R.Civ.P. 54(b). According to Lehman, the count alleging breach of fiduciary duty and seeking return of the investment banking fee—which was not dismissed by summary judgment—overlapped with the securities claims. Settlement of the claim for return of the investment banking fee, on October 25, 1991, prior to oral argument, however, rendered Lehman's cross-appeal moot.

**2.** Initially, Litton also sought the following damages: (1) the amount it overpaid for its open market purchases of Itek stock; (2) disgorgement of all profits, fees, and commissions resulting from the inside trades by the defendants; (3) the return of fees paid to Lehman for services relating to the Itek acquisition; and (4) punitive damages in connection with these common law claims. With regard to the alleged damages from open market purchases, Litton, BLI, and Bank Leu entered into a settlement agreement; as part of the agreement, Litton agreed to a dismissal with prejudice, pursuant to Fed.

R.Civ.P. 41(a)(2), of its open market claims against all defendants.

In its orders of April 18, 1990, reported at 734 F.Supp. 1071 (S.D.N.Y.1990), and April 27, 1990, the district court dismissed the disgorgement claims against Bank Leu, BLI, and their employees on the grounds that they had already disgorged to the SEC their full profits from their Itek involvement. The disgorgement claims against Levine, Sokolow, Wilkis, and Meier, however, are an alternate remedy to the tender offer overpayment claims, and thus are viable only to the extent that the tender offer claims are viable.

The district court dismissed, in its June 4, 1991 order, Litton's breach of contract claims against Lehman for return of the investment banking fee. The issue whether Lehman, as an investment banker, owed Litton a fiduciary duty as of early November 1982 was the sole issue of fact the district court reserved for trial. The parties settled this claim on October 25, 1991.

BLI (Jean–Pierre Fraysse and Christian Schlatter) began purchasing additional shares of Itek stock for both BLI and themselves. Levine also tipped Robert Wilkis, an investment banker at Lazard Freres & Co., concerning Litton's acquisition plans. Wilkis purchased Itek stock through an offshore bank account. By the time Litton publicly announced its tender offer, on January 14, 1983, Levine and his cronies had purchased approximately 60,-000 shares of Itek stock; and the market price of Itek stock had reached approximately $33 per share.

Litton, meanwhile, had begun to negotiate with Itek. Throughout these negotiations Litton adhered to its strategy of acquiring Itek through a friendly tender offer. At a November 23, 1982 meeting Fred O'Green, chairman of Litton's Board of Directors, told Robert Henderson, chairman of Itek's Board of Directors, that Litton was exploring "the possibility of acquiring the whole of [Itek by] a tender offer for cash on a friendly basis if we could come to a set of circumstances that [was] acceptable to both [parties]."

By early January 1983, the negotiations had progressed to the stage at which Litton's Executive Committee was assessing how much to offer per share of Itek stock. Relying on the advice of Lehman, Litton believed a fair price to be equivalent to the current market price of Itek common stock plus a 50% premium. The Committee authorized O'Green to make an initial offer of $42.50 per share. After discussions with Itek, O'Green, realizing that Itek would regard the offer as too low, declined to convey it to the Itek Board. On January 10, 1983, Litton offered Itek $46 per share for Itek common stock. The Itek Board met to consider that offer on January 12, 1983. Without rejecting the offer, the Itek Board elected to explore whether Litton would offer "a little bit more."

The next day Litton raised its offer to $48 per share. The Itek Board reconvened, and—after receiving a favorable fairness report from its investment banker, First Boston Corporation—voted to recommend the offer to its shareholders. On January 14, 1983, Litton publicly announced the tender offer. Subsequent to the announcement of the tender offer, the trader defendants sold their Itek shares for a profit.

The tender offer commenced on January 17, 1983 and concluded successfully on March 4, 1983: Itek was merged into a subsidiary of Litton and the outstanding shares were converted into a right to receive $48 per share. When Levine's activities became public in 1986, Litton brought this action to recover damages. Litton avers that the trader appellees' purchases forced the price per share of Itek common stock to rise, which in turn resulted in Litton's payment of an inflated price for the Itek acquisition.

II

■ The district court found that Litton could prove no facts that would establish the causation element of the section 10(b)/rule 10b–5, civil RICO, and common law tort claims. Because the causation element is essential to all of these claims, the district court concluded that summary judgment was appropriate. 709 F.Supp. at 449, 452–53. On appeal from a grant of summary judgment we review the record de novo, applying the same standard employed by the district court. *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 152, 116 L.Ed.2d 117 (1991). According to Fed.R.Civ.P. 56(c), summary judgment should be granted if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). Viewing the record in the light most favorable to the nonmoving party—in the case before us, Litton—we must determine whether a reasonable jury could find that Litton's alleged injury was caused by defendants' illicit trading. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

III

For Litton to recover under section 10(b)/rule 10b–5, civil RICO, or common

law tort it must establish that the trader appellees' violations caused its loss. *See Bennett v. United States Trust Co.*, 770 F.2d 308, 313–16 (2d Cir.1985), *cert. denied*, 474 U.S. 1058, 106 S.Ct. 800, 88 L.Ed.2d 776 (1986); *Hecht v. Commerce Clearing House, Inc.*, 897 F.2d 21, 23–24 (2d Cir. 1990). In the case at hand, there are three links that are required to establish the chain of causation: (1) the trader appellees purchased stock on the basis of misappropriated information; (2) this trading inflated the market price of Itek stock; and (3) the Itek Board of Directors would have accepted a lower offer from Litton, if not for the artificially inflated market price of Itek stock. The district court dismissed the claims at issue in this appeal on the grounds that there was no genuine issue of material fact as to the last link of the causal chain. Litton challenges the dismissal on two bases. First, it contends that, with respect to the section 10(b)/rule 10b–5 claims, *appellees* should have the burden of persuading the trier of fact that absent insider trading the Itek Board would have held out for $48 per share.[3] Second, Litton argues that, even if it has the burden of establishing the final link in the causal chain, there is a triable issue whether the Itek Board would have accepted a lower offer if not for an artificially inflated market price for Itek stock.

■ To fully address these arguments it is necessary to analyze what proof of causation entails. The causation analysis encompasses two related, yet distinct elements—reliance and causation—elements that, in effect, correspond respectively with common law notions of "but for" and proximate causation. *See Bloor v. Carro, Spanbock, Londin, Rodman & Fass*, 754 F.2d 57, 61–62 (2d Cir.1985); *Schlick v. Penn–Dixie Cement Corp.*, 507 F.2d 374, 380 (2d Cir.1974), *cert. denied*, 421 U.S. 976, 95 S.Ct. 1976, 44 L.Ed.2d 467 (1975); *Huddleston v. Herman & MacLean*, 640 F.2d 534, 548–49 (5th Cir.1981), *aff'd in part, rev'd in part*, 459 U.S. 375, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983). To satisfy the

reliance element requires a showing that the violations under consideration caused the plaintiff to engage in the transaction, i.e., transaction causation. *See Schlick*, 507 F.2d at 380; *see also Wilson v. Ruffa & Hanover, P.C.*, 844 F.2d 81, 85 (2d Cir. 1988), *aff'd*, 872 F.2d 1124 (2d Cir.1989). To satisfy the causation element requires a showing that the violation caused the plaintiff's alleged economic loss, i.e., loss causation. *Schlick*, 507 F.2d at 380.

### A

### *Presumptions of Transaction Causation*

At issue in this case are Litton's confidentially disclosed acquisition plans—plans that Levine and his cohorts used for their own gain. The key issue is thus whether Litton as owner of the misappropriated information would have acted differently in connection with the Itek acquisition if employees of its investment banker and their tippees had not distorted the market price of Itek stock.

■ The district court premised its dismissal primarily on Litton's failure to establish the loss causation element; transaction causation did not play a significant role in the district court's analysis. We discuss the matter further because, based on cases which permit a rebuttable presumption of *transaction causation*, Litton claims it is entitled to benefit from a rebuttable presumption of *loss causation* with respect to its section 10(b)/rule 10b–5 claims. In certain circumstances, a plaintiff bringing a section 10(b)/rule 10b–5 claim benefits from a rebuttable presumption of transaction causation or reliance. Two distinct forms of the presumption coexist. First, in a line of cases beginning with *SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 849 (2d Cir.1968) (en banc), *cert. denied*, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969), and culminating in *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 153–54, 92 S.Ct. 1456, 1472, 31 L.Ed.2d 741 (1972), transaction causation—

---

3. Litton argues that, in effect, it need only establish the following causal chain: (1) the price of the security was artificially inflated by the fraud

and (2) Litton purchased the shares at an artificially inflated price.

or as *Affiliated Ute* terms it, "causation in fact," 406 U.S. at 154, 92 S.Ct. at 1472—has been presumed, if a plaintiff's claim is based on a defendant's failure to disclose material information. *See duPont v. Brady*, 828 F.2d 75, 78 (2d Cir.1987); *Titan Group, Inc. v. Faggen*, 513 F.2d 234, 239 (2d Cir.), *cert. denied*, 423 U.S. 840, 96 S.Ct. 70, 46 L.Ed.2d 59 (1975). Because, in such situations, the plaintiff is unaware of the omitted information, the record generally fails to provide a basis from which a finder of fact may evaluate how the plaintiff would have reacted if he or she had been aware of the withheld information. Second, a plaintiff may also, subject to rebuttal, establish transaction causation by means of the "fraud on the market" theory, which permits a plaintiff to rely on the integrity of open, well-developed markets rather than requiring proof of direct reliance on a defendant's conduct, which ordinarily would be difficult to come by given the difference between today's markets and the face-to-face transactions underlying the old common law fraud cases, in which reliance played an essential role. *Basic Inc. v. Levinson*, 485 U.S. 224, 243–47, 108 S.Ct. 978, 989–91, 99 L.Ed.2d 194 (1988).

A presumption is thus appropriate in at least these two types of situations due to the extreme difficulty in demonstrating transaction causation. To saddle a plaintiff with proving the "generally indeterminable fact of what would have happened but for the omission [or the misrepresentations that skewed the market value of stock] would reduce the protection against fraud afforded by Section 10(b)." *duPont*, 828 F.2d at 78; *see also Basic*, 485 U.S. at 245–46, 108 S.Ct. at 990–91; *Chris–Craft Indus. v. Piper Aircraft Corp.*, 480 F.2d 341, 374–75 (2d Cir.1973), *rev'd on other grounds*, 430 U.S. 1, 97 S.Ct. 926, 51 L.Ed.2d 124 (1977). The reliance presumption—arising from considerations of fairness, policy, probability, and judicial economy, *Basic Inc.*, 485 U.S. at 245, 108 S.Ct. at 990—reallocates the risks of mistaken adjudications, resolving questions of doubt in favor of the investors that section 10(b) seeks to protect. Although we believe the

question of transaction causation or Litton's reliance raises an issue of triable fact, Litton has no need of a presumption; all the proof it needs of its own reliance lies in its own hands.

## B
### *Loss Causation*

■ Litton takes the presumption argument a step further in connection with its proof of loss causation and argues that the same concerns that spawn a transaction causation presumption militate for a presumption that the Itek Board relied on the market—which, in the present context, would mean a presumption of one component of what Litton must prove to establish loss causation.

Proof whether the Itek Board relied on the market, however, involves few of the evidentiary uncertainties exhibited in either the omission or fraud-on-the-market context. In the case at hand—unlike the omission situation—Itek knew of the crucial information, that the market price of Itek stock had risen and that Litton had plans to acquire Itek. And—unlike the fraud-on-the-market context—the face-to-face negotiations between the acquirer and the target boards in a friendly tender offer situation, as here, make the question of the target board's reliance an issue of determinable fact.

Litton argues, relying on *Chris–Craft Industries*, that when loss causation requires proof of third-party reliance a presumption of third-party reliance is appropriate. In *Chris–Craft Industries*, we recognized that to establish the defendant's wrongful interference with plaintiff's tender offer to third-party shareholders, the plaintiff need not show that *it* relied upon defendant's violation. 480 F.2d at 373. We noted that when the harmful effect of the defendant's violation depends on the volition of third parties, the plaintiff need only demonstrate that the *third party* relied on the violation. Because it would have been "unduly burdensome" and "impractical" to require the plaintiff to prove that each shareholder relied on defendant's violation, in *Chris–Craft* we presumed the shareholders' reliance as well. *Id.* at 375. Litton claims that this amounted to a pre-

sumption of loss causation[4] and, being a similarly situated plaintiff, it too should be accorded such a presumption. We disagree. In the case at hand, proof that the Itek Board relied on the market does not involve a *Chris–Craft*-like burden of establishing the inclinations of a large number of shareholders. We, therefore, affirm the district court's finding that Litton must prove actual reliance on the part of the Itek Board.

To satisfy the loss causation requirement, Litton must establish that absent insider trading in Itek stock, Litton would have acquired Itek at a lower price per share. To demonstrate this, Litton must show that the appellees' trading caused the market price of Itek stock to rise *and* that the market price was a substantial factor in the Itek Board's assessment of Litton's offers. For the purposes of summary judgment, the appellees accepted the proposition that the trader defendants caused the market price of Itek stock to rise; therefore, the district court focused on whether, absent artificial inflation of the stock price, the Itek Board would have been willing to accept less than $48 per share. For the purposes of reviewing the district court's grant of summary judgment, we need only consider whether there is a genuine issue of whether the then-current market price of Itek stock played a substantial role in the Itek Board's decision.

■ A rational bidder planning a tender offer seeks to estimate the minimum premium required to induce a sufficient percentage of the target's shareholders to tender their shares. Lynn A. Stout, *Are Takeover Premiums Really Premiums? Market Price, Fair Value, and Corporate Law*, 99 Yale L.J. 1235, 1281–82 (1990). The rule of thumb for calculating the minimum acceptable offer at the time of the Itek acquisition was a 50% premium above the pre-announcement price of the target shares. *See Corporate Mergers Rose 8% Last Year to 2,533, the Most Since 1974*, Wall St.J.,

Jan. 13, 1984, at 46 (median premiums 50% above market price in 1983); Note, *Insider Trading by Intermediaries: A Contract Remedy for Acquirers' Increased Costs of Takeovers*, 97 Yale L.J. 115, 129 & n. 67 (1987). A change in the market price of the target company's stock, therefore, alerts the target that it can exact a higher premium. *Id.* at 130. In assessing the fairness of an offering price, however, the board of directors of the target company must consider the inherent value of their corporation as well as what the potential acquirer can be induced to pay. *See Smith v. Van Gorkom*, 488 A.2d 858, 875–76 (Del. 1985). Factors other than market price plus premium, thus, may and often do legitimately enter into the target board's determination of value. *See Viacom Int'l Inc. v. Icahn*, 946 F.2d 998, 1000–01 (2d Cir. 1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 1244, 117 L.Ed.2d 477 (1992). The district court properly pointed these out as including "asset value, dividends, earning prospects, the nature of the enterprise and any other facts ... which throw any light on *future prospects*." 709 F.Supp. at 447 (quoting *Weinberger v. UOP, Inc.*, 457 A.2d 701, 713 (Del.1983)).

The district court decision probably has to be read as accepting the proposition that market price considerations played no role or a very insubstantial role in the Itek Board's decision. 709 F.Supp. at 447. It is difficult to imagine, however, any pricing decision by a responsible target board in which market price considerations played no role. The essential question in a tender offer, after all, is whether the offer is more attractive than the available alternatives. In assessing the alternative of continued independence, the market price of the stock is the central consideration, at least for the public shareholders in the usual situation. *See* Stout, *supra*, 99 Yale L.J. at 1282. From the record there is every indication that the Itek Board was aware of its responsibility to the shareholders. The most favorable interpretation of the district court's determination is that the Itek Board

---

**4.** It is difficult to discern from *Chris–Craft* whether we presumed loss causation or simply inferred it from the presumption of third party reliance. *See Chris–Craft*, 480 F.2d at 375; *see*

also *Madison Consultants v. FDIC*, 710 F.2d 57, 65 n. 6 (2d Cir.1983); Note, *Causation in Rule 10b–5 Actions for Corporate Mismanagement*, 48 U.Chi.L.Rev. 936, 948–49 (1981).

believed that the value of Itek stock was higher than any "market price plus premium" that Litton might have offered based on a market untainted by insider trading; thus the market price did not play a substantial role in the Itek Board's decision-making. *See* 709 F.Supp. at 446.

■ The district court based its decision on affidavits from members of Itek's Board—affidavits detailing the Board members' recollections of the transaction. These affidavits, indeed, provide evidence that the majority of the Board members in assessing the value of Itek stock looked primarily to what they referred to as the inherent value of the company, which they thought to be greater than the $46 per share initially offered by Litton. The question before us is whether these affidavits establish that there is no genuine issue of fact concerning whether, absent insider trading, Litton might have acquired Itek for less than $48 per share.

Litton argues that the fairness report prepared by First Boston, Itek's investment banker, reveals that the Itek Board was both aware of the market price plus premium method of pricing and itself relied on such a pricing method to evaluate Litton's offers. On January 12–13, 1983, First Boston presented a study to the Itek Board concerning Litton's offer. The study, which was fully explained to the Board in a series of presentations, detailed the market price of Itek stock between September 1, 1982 and January 10, 1983 and compared Litton's bid with bids for similarly situated companies with respect to the ratio of premium to market price. It also included a Value Line report on Itek that prominently displayed Itek's "recent price" of $32 and price/earnings ratio of 23.9. On the basis of its study, First Boston concluded that Litton's offer was fair. Although the Board members now deny that they relied on the methods set forth by the study, the schedule 14D-9 "Solicitation/Recommendation Statement" sent to the shareholders in connection with the $48 offer stated that the Board had relied in part on First Boston's report in reaching its recommendation. Itek Chairman Robert Henderson's letter to the shareholders recommending acceptance of the tender offer also indicated that careful consideration was given to First Boston's advice. Furthermore, the final price recommended by the Itek Board provides some circumstantial evidence that the Board may have relied on the market price plus premium. The closing price on January 11, 1983 was $32.50 per share. Calculating on the basis of this price, the market price plus 50% premium totals to $48.75—almost the exact price that the Itek Board approved on January 13.

In addition, although many of the Itek Board members recite that they relied on Itek's inherent value, there appears to have been neither a discussion of the inherent value of the company at the relevant Board meetings nor a report determining that value. In fact, the only assessment of Itek that might be construed as positing that the company's true value diverged from its market value was a three-year strategic plan being put together by Henderson when he was first approached by Litton; this strategic plan, like others before it, did not discuss market price of the stock. Although the plan did not assess the company's value, Henderson and other Board members concluded, based on the plan, that, if all went well, Itek stock would be selling at perhaps $50–52 per share in three years. When faced with Litton's initial offer, however, Henderson himself determined that $46 was a fair offer when his valuation was discounted for risk. Although the majority of the Itek Board members now avow that they would not have accepted the $46 offer, the record indicates that they did not reject Litton's initial offer. Instead, they sent Henderson back to the negotiating table to see if he could work out a better deal. When Litton offered $48 per share the Itek Board unanimously voted to recommend the offer to the shareholders, which suggests that the other Board members who believed that Itek stock was worth upwards of $50 per share also were willing to discount that value for market considerations. The Itek Board's conduct, thus, is open to more than one interpretation. The Itek Board's failure to reject the $46 offer and its willingness to accept $48 suggest that the Board members might have been in search of the

best offer the market would bear instead of waiting for a bidder to match either what they believed was their company's inherent value or what the market price might reach in three to five years. The market price and current pricing practices may have been central to any assessment of what the market will bear.

In a situation such as this, in which thought processes of the Itek Board and the theory that best characterizes their conduct are at issue, caution must be exercised in granting summary judgment. *See Wechsler v. Steinberg*, 733 F.2d 1054, 1058–59 (2d Cir.1984) (concluding that in a section 10(b) scienter analysis "[i]ssues of motive and intent are usually inappropriate for disposition on summary judgment"). Exercising such caution, we find, when viewing the record in the light most favorable to Litton, that a reasonable jury might find that market price was a substantial factor in the Itek Board's assessment of Litton's offer and that absent insider trading the Itek Board would have accepted less than $48 per share.

## IV

On appeal appellees further raise the argument that in the wake of *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, — U.S. —, 111 S.Ct. 2773, 2782, 115 L.Ed.2d 321 (1991)—which held that private actions under section 10(b)/rule 10b–5 must be filed within one year of the discovery of fraud and no later than three years after the transaction—Litton's section 10(b)/rule 10b–5 claims are time-barred. Litton brought this action on August 19, 1986, more than three years after the last of the securities transactions, which occurred in January 1983; therefore, if the one year/three year limitations period enunciated in *Lampf* applies retroactively, Litton's section 10(b)/rule 10b–5 claims would be time-barred. *Lampf* and a companion case

*James B. Beam Distilling v. Georgia*, — U.S. —, 111 S.Ct. 2439, 115 L.Ed.2d 481 (1991), when read in concert require retroactive application of the new limitations. *Lampf* applied the newly announced limitations retroactively, and in *Beam*, 111 S.Ct. at 2446, the Court held that, in civil cases, a new rule must be applied retroactively, if the case announcing the rule had given the rule retroactive effect.

Litton's section 10(b)/rule 10b–5 claims would be time-barred, if the story had ended there. On December 19, 1991, however, Congress amended the 1934 Act, enacting section 27A to modify the retroactive effect of *Lampf*. *See* Federal Deposit Insurance Corporation Improvement Act of 1991, § 476, Pub.L. No. 102–242, 105 Stat. 2236, 2387. Section 27A requires us to assess whether the laws applicable as of June 19, 1991 (the day before *Lampf* and *Beam* were filed)—including the principles of retroactivity—would bar Litton's section 10(b)/rule 10b–5 claims.[5] Following the enactment of section 27A, to determine which statute of limitations governs section 10(b)/rule 10b–5 claims filed prior to June 20, 1991, we must engage in a case-specific determination of whether our own one year/three year rule adopted in *Ceres Partners v. GEL Assocs.*, 918 F.2d 349 (2d Cir.1990) applies retroactively. *Henley v. Slone*, 961 F.2d 23, 26 (2d Cir.1992); *see also Welch v. Cadre Capital*, 923 F.2d 989, 992–95 (2d Cir.), *vacated*, — U.S. —, 111 S.Ct. 2882, 115 L.Ed.2d 1048, *aff'd*, 946 F.2d 185 (2d Cir.1991).[6] If the *Ceres* limitations do not apply retroactively, then we adopt the statute of limitations applicable in the forum state. *Henley*, at 26; *see also Ceres*, 918 F.2d at 352–53.

■ Before embarking on this analysis, however, we need to determine whether appellees may have waived their right to raise a statute of limitations defense. A claim that a statute of limitations bars a

---

**5.** Section 27A(a) provides:
  The limitation period for any private civil action implied under section 10(b) of this Act that was commenced on or before June 19, 1991, shall be the limitation period provided by the laws applicable in the jurisdiction, including principles of retroactivity, as such laws existed on June 19, 1991.

**6.** Although the parties have not suggested that section 27A is unconstitutional, we are aware

that several district courts have so held, but, like Judges Conner and Lasker, we are unimpressed by the cogency of their analysis. *Compare Bank of Denver v. Southeastern Capital Group, Inc.*, 789 F.Supp. 1092 (D.Colo.1992) *and TGX Corp. v. Simmons*, 786 F.Supp. 587 (E.D.La.1992) *with Brown v. The Hutton Group*, 795 F.Supp. 1307

suit is an affirmative defense, and, as such, it is waived if not raised in the answer to the complaint. Fed.R.Civ.P. 8(c); *see United States v. Continental Ill. Nat'l Bank and Trust Co.*, 889 F.2d 1248, 1253 (2d Cir.1989); 5 Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1278 (1990). Appellees claim that they have not waived their right to raise a statute of limitations argument. This claim has merit in the case of Lehman, but is baseless in the case of Bank Leu. Lehman has consistently asserted the statute of limitations defense in its answers. Bank Leu, however, failed to raise the issue in its third answer and thereby waived it.

On the merits, the statute of limitations argument fails for Lehman. Resolution of the statute of limitations issue depends on whether the one year/three year rule adopted in *Ceres* applies retroactively in this case. We determine whether to exercise the *Ceres* rule retroactively by applying the three-part test set out in *Chevron Oil Co. v. Huson*, 404 U.S. 97, 106–107, 92 S.Ct. 349, 355, 30 L.Ed.2d 296 (1971). *See Henley*, 961 F.2d at 26; *see also Welch*, 923 F.2d at 992–95. A *Chevron* analysis requires first that the court determine whether the rule at issue establishes a new principle of law, *Welch*, 923 F.2d at 993. If it does, the court must then " 'weigh' in each case whether retroactive application would conflict with the purposes of the rule and whether it would produce inequitable results." *Id.*

As in *Welch*, a *Chevron* analysis of the appellee's statute of limitations claim leads to the conclusion that the *Ceres* rule should not be applied retroactively in this case. First, as a threshold matter, the *Ceres* rule established a new principle of law. *Id.* at 994. Second, the purpose of the *Ceres* rule would not be furthered by retroactive application. In a conclusion equally applicable to the present case, the *Welch* court stated that "application of a limitations period not yet in existence at the time suit was commenced clearly does not further" the purpose of the *Ceres* rule. *Id.* at 995. Finally,

(S.D.N.Y.1992) *and Axel Johnson, Inc. v. Arthur Andersen & Co.*, 790 F.Supp. 476 (S.D.N.Y.1992). *See also Robertson v. Seattle Audubon Soc'y*, —— U.S. ——, 112 S.Ct. 1407, 1413, 118 L.Ed.2d 73

the equities favor a prospective application of *Ceres*. Appellant filed its case soon after discovery of the alleged fraud and there is no evidence to suggest that appellant delayed filing in order "to achieve a tactical advantage." *Id.*

V

We find that there is a genuine issue of material fact concerning whether Litton would have acquired Itek at a lower price absent appellees' illicit trading. We therefore reverse the district court's order dismissing Litton's section 10(b)/rule 10b–5, civil RICO, and common law claims for overpayment in connection with its tender offer and acquisition of Itek.

MESKILL, Circuit Judge, dissenting:

I agree with the majority's treatment of the statute of limitations issue. I also agree with the majority that the question of the target board's reliance on the artificially altered market price is a reasonably determinable question of fact. Therefore, I agree that Litton, the plaintiff, bears the burden of proving that reliance. However, I part company with the majority in its application of summary judgment principles to this record.

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate when the record shows that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). Because the defendants will not bear the burden of proof at trial on the issue of the Itek Board's reliance, they need not negate reliance at the summary judgment stage either; rather, they may establish the absence of a genuine issue as to reliance by the Itek Board by showing the absence of evidence of reliance in a well developed record. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). The issue in dispute here, reliance on the market price, must be genuine; a mere scintilla of evidence will not suffice to defeat summary judgment. *See Anderson v. Liberty Lobby*, 477 U.S. 242, 247–52, 106 S.Ct. 2505,

(1992) (statute may permissibly affect the outcome of a case, but may not direct findings of fact).

2509–512, 91 L.Ed.2d 202 (1986). I disagree with the majority's conclusion that this record contains evidence from which a reasonable jury could conclude that the Itek Board relied in any meaningful way on the then-current market price.

None of the Itek Directors offered testimony sufficient to support a finding of reliance. The majority places heavy reliance on the fairness opinion given the Itek Board by the investment firm First Boston. There is evidence that the Itek Board relied on First Boston's evaluation of the $48/share offer as "fair" in recommending that the stockholders accept that offer. There is also evidence that, in reaching its conclusion that $48/share was fair, First Boston relied in part on market price analysis, including an examination of the "premium over [market] price" of comparable acquisitions. The majority concludes that the Itek Board thus relied on a "market price plus premium" formula in assessing the offer.

The record evidence does not support this conclusion. There was evidence that First Boston regarded the premium over market price to be one of several relevant factors in assessing the fairness of a tender offer, but the record does not show that there was any particular size premium that rendered an offer "fair." The comparable acquisition data compiled by First Boston indicated the relationship between market price and acquisition price for a number of acquisitions it deemed comparable to the Litton/Itek deal. Those acquisitions resulted in "premiums" that ranged from a 23.2% discount *below* market price to a 121.1% premium above market price. The average premium of those companies presented in the First Boston pricing report was approximately 64% above market price.

The majority asserts that the fact that the ultimate price recommended by the Itek Board to the shareholders was almost exactly 50% above the then-prevailing market price is circumstantial evidence that the Board utilized the "50% premium" method the majority earlier asserted as the prevalent "rule of thumb for calculating the minimum acceptable offer" in tender offer

situations at that time. If there were any evidence in the record that there was in fact an accepted "50% premium" method of assessing a fair price for a stock in a takeover situation, the near perfect conformity of the ultimately accepted price to that method would be strong circumstantial evidence that the method had been utilized.

The record evidence, however, does not support a finding that such a method in fact was prevalent or was known by the members of the Itek Board. There is no evidence that the First Boston presentation focused on a 50% above market method of analysis. As noted above, the premiums First Boston reported for comparable acquisitions varied widely. Moreover, of the sixteen acquisitions for which this data was presented, only one was even within five percentage points of 50% (45.9%).

The majority relies only on materials outside the record to support its contention that there was a prevalent "50% premium" rule of thumb in existence at the time of this acquisition. Neither the Yale Law Journal article nor the Wall Street Journal article is part of this record and thus cannot be used to raise an inference of reliance by the Itek Board. Moreover, the support to which the majority directs us does not purport to present such a "rule of thumb" for a "minimum acceptable offer." *See* Note, *Insider Trading by Intermediaries: A Contract Remedy for Acquirers' Increased Costs of Takeovers*, 97 Yale L.J. 115, 129 & n. 67 (1987); *Corporate Mergers Rose 8% Last Year to 2,533, The Most Since 1974*, Wall Street Journal, Jan. 13, 1984, at 46. Rather, they simply note that the average acquisition price during the early 1980s was about 50% above the prior prevailing market price. Acquisition price may always be expressed in terms of prior prevailing market price. That is hardly evidence of how a particular acquisition price was determined.

In short, the fact that the price ultimately agreed to by the Itek Board was roughly 50% above the then-current market price does not imply that the Board used that market price in determining that the $48/share price was acceptable.

This record is entirely devoid of evidence from which a reasonable jury could conclude that the Itek Board relied on the then-current market price in any way relevant to this dispute in making its recommendation to stockholders regarding the Litton offer. I, therefore, would affirm the entry of summary judgment in favor of defendants.