Albert BAUGH, individually, Lue Ethel Roby, individually, Albert Baugh and Ethel Huffman, as special co-administrators of the estates of Tremain Baugh, Sharonda Baugh, Shatoya Baugh, Tyrone Baugh (hereinafter the deceased minor Baugh children), and Varnessa Baugh (hereinafter the deceased mother/spouse or daughter), Annie Ruth Phillips, individually and as special administrator of the estates of Shanika Dacas and Lashawanda Dacas (hereinafter the deceased minor Dacas children), and Angela Von Jefferson Woods, individually and as special administrator of the estates of Sharina Woods, Shawonda Woods, and Randy Woods (hereinafter the deceased minor Woods children), Plaintiffs,

v.

The CITY OF MILWAUKEE, a municipal corporation at 200 East Wells Street, Milwaukee, WI 53203, John Norquist, in his official capacity as mayor of the City of Milwaukee, Lee C. Jensen, individually and officially as Commissioner of

Building Inspections, Inspector Carol Maglio, individually, and Thomas Donegan, in his official capacity only as president of the Common Council, City of Milwaukee, and (for those sued in an official capacity) all successors and agents in office, Defendants.

No. 88–C–1230.

United States District Court,
E.D. Wisconsin.

June 16, 1993.

Gregory Victor, Adorno & Zeder, Miami, FL, for plaintiffs.

Maurita Houren, Asst. City Atty., Milwaukee, WI, for defendants.

TERENCE T. EVANS, Chief Judge.

This civil rights case arises from a tragic fire that consumed a house at 1738 North 23rd Street in Milwaukee on September 30, 1987. Twelve people, including ten children, perished in the fire. The exact cause of the fire has never been established, although an officer from the Milwaukee Police Department's Bomb and Arson Squad concluded that the fire originated near a couch in a first floor room and that traces of gasoline were found in that area. The estates of ten of the deceased persons and certain relatives of the deceased have brought this lawsuit under 42 U.S.C. §§ 1981 and 1983, alleging that the City of Milwaukee and several of its officials (sometimes collectively referred to as "the City") violated the deceased persons' civil rights by discriminating against them because they were black. The following facts are undisputed unless noted otherwise.

The City of Milwaukee Building Inspection Department ("Department") administers and enforces chapters 200 to 290 of the Milwaukee Code of Ordinances, entitled "Revised Building and Zoning Code of 1986" ("Code"). In 1987, the Department was divided into five sections. One of those sections was responsible for code enforcement. The code enforcement section was further divided into a residential division and a commercial division. In 1987, the Department employed about 58 inspectors, with about half in the residential division and half in commercial. Each inspector was responsible for an assigned geographical area within the city.

In 1987, Wisconsin Statute § 101.14(2)(b) and the Code placed upon the Department the responsibility of providing yearly fire inspections of all buildings, premises, structures, and public thoroughfares, except the interior of private dwellings. Only commer-

cial buildings and residential properties with three or more family units required and received regular fire inspections.

Although not legally required, one- and two-family residences were inspected upon request. A request usually was made by a tenant, owner, neighbor, or alderperson's office. When requested by a citizen, the inspection was referred to as a citizen complaint inspection. If the source of the request was an alderperson's office, the inspection was referred to as an aldermanic referral inspection. Although denominated separately, aldermanic referrals were essentially citizen complaints because they were usually triggered by a citizen calling his or her alderperson rather than the Department.

Inspections of single-family or duplex properties could also occur in a few other situations. For example, if properties adjacent to a residence being inspected showed conditions warranting the issuance of orders, an inspector could perform a self-initiated inspection. If the inspector was looking at one unit of a duplex, he or she was encouraged to attempt access to the other unit for a self-initiated inspection. Also, certain properties had to be inspected at the time of sale, for condemnation purposes, or in conjunction with a government-sponsored rehabilitation loan program.

On September 2, 1987, tenant Annie Phillips requested by telephone that her single-family residence at 1738 North 23rd Street be inspected by a city building inspector. A citizen's complaint form was completed by the inspection department and Ms. Phillips' claims were noted as follows: "ceiling leaking on 2NFL., toilet leaks, mice and other violations."

On September 8, the inspector for that area of the city, Carol Maglio, visited the premises.[1] Upon Ms. Maglio's questioning, Ms. Phillips stated that she lived in the house with her children and that Ms. Phillips' sister and her children were staying there temporarily while visiting from Florida. Ms. Maglio inspected the interior and exterior of the premises and reported twenty-three viola-

tions against the property. An "Order to Correct Condition of Premises" was served on Emmet Echols, the owner of the property, on September 16, 1987. Mr. Echols had 60 days to comply with the order.

Twenty-two days after the inspection, the fatal fire erupted at the house. The plaintiffs do not allege that any violation that Ms. Maglio failed to detect or that any conduct of the defendants actually caused the fire. This lawsuit focuses instead on smoke detectors and the responsibility for their installation.

In 1987, section 250–12 of the Milwaukee Code of Ordinances required the occupant of a one- or two-family residence to install at least one smoke detector. In a non-owner occupied one- or two-family residence, then, the tenant rather than the owner had the responsibility to install the smoke detector.

Whether or not a smoke detector was installed in the house on either the date of the inspection or the date of the fire is disputed. In testimony during a separate action arising from the same facts, Mr. Echols testified that smoke detectors had been installed, and a gas company employee testified that when he visited the premises on September 13, 1987, he saw a smoke detector lying on the floor. Ms. Phillips, though, has stated that there were no smoke detectors in the house.

It is clear that Ms. Phillips was not cited for any smoke detector or other code violation. But, assuming a smoke detector was not present, whether Ms. Maglio informed or counseled Ms. Phillips about the requirement *is* a disputed fact. In their amended complaint, the plaintiffs claim that Ms. Maglio failed to note "the absence of smoke detectors and she did not inform Phillips or the building owner of the requirement mandating their installation." Amended complaint at ¶ 40. Although Ms. Maglio cannot recall whether she actually counseled Ms. Phillips on September 8, 1987, about the requirement, she states that her normal procedure was to so advise the occupant if there was no smoke detector.

1. In September 1987, Ms. Maglio was assigned to the geographical area of 20th to 24th Place and Galena Street to Capitol Drive.

Presently pending before me is the City's motion for summary judgment, which was filed back in December 1991. After several intervening discovery disputes and extensions of time, the briefing is now complete and the motion ripe for resolution. Further facts will be discussed in the remainder of this opinion.

### Motions to Strike

Two preliminary matters must be addressed. Each party has filed a motion to strike some of the opponent's affidavits. The defendants moved to strike the affidavits and exhibits of experts James H. Johnson and Michael Slifka, which were filed with the plaintiffs' opposition brief. The plaintiffs have moved to strike the supplemental affidavits and attached exhibits of Mary Stott, Schuyler Seager, and attorney Stuart S. Mukamal, which were filed with the reply brief. Because the Seager affidavit also supports the defendants' motion to strike, I will deal with the latter motion first.

■ The plaintiffs' motion to strike is based on a hypertechnical reading of Federal Rules of Civil Procedure 6(d) and 56(e) and local rule 6.01. Their argument is a version of the maxim *"Expressio unius est exclusio alterius."* [2] The pertinent portion of rule 6(d) reads:

> When a motion is supported by affidavit, the affidavit shall be served with the motion; and, except as otherwise provided in Rule 59(c) [dealing with a motion for a new trial], opposing affidavits may be served not later than 1 day before the hearing, unless the court permits them to be served at some other time.

Although rule 6(d) addresses supporting and opposing affidavits, it is silent as to the submission of reply affidavits, *Litton Industries, Inc. v. Lehman Bros. Kuhn Loeb, Inc.,* 767

F.Supp. 1220, 1235 (S.D.N.Y.1991), *rev'd on other grounds,* 967 F.2d 742 (2d Cir.1992), or the submission of any briefs whatsoever.

Local rule 6.01 states that:

> (a) Every motion shall set forth the rule pursuant to which it is made and shall be accompanied by (1) a supporting brief and, when necessary, affidavits or other documents....
>
> ....
>
> On motions for summary judgment, the opposing party shall serve an answering brief and affidavits or other documents within 30 days of the service of the motion; the movant may serve a reply brief within 15 days of the answering brief.[3]

Further, a "reply brief shall be limited to matters in reply." Local rule 6.01(c). Although the local rule provides for briefing, again nothing at all is said about reply affidavits.

The plaintiffs also point to Fed.R.Civ.P. 56(e), which discusses only affidavits in support of or in opposition to a motion for summary judgment and states (emphasis added) that the judge *"may permit* affidavits to be supplemented." Since these rules do not provide for reply affidavits and no permission has been given in this case, the plaintiffs believe that the reply affidavits are improper.

I do not believe that reply affidavits which are limited to matters in reply violate any of the above rules just because they are not specifically provided for. It seems absurd to say that reply briefs are allowed but that a party is proscribed from backing up its arguments in reply with the necessary evidentiary material.[4] Such a rule would allow the party opposing the motion to gain an unfair advantage by submitting issues and evidentiary support that were unforeseen at the

---

**2.** The expression of one thing implies the exclusion of another. Black's Law Dictionary 521 (5th ed. 1979).

**3.** At the time that the summary judgment motion in this case was filed, the rule was a bit different, but the only substantive difference consists of the length of time allowed each side for filing, which back in 1991 was 14 days and 11 days, respectively.

**4.** The absurdity of such a rule is evidenced by the plaintiffs' own reply brief on this motion to strike. After arguing that the defendants cannot attach any affidavits or exhibits to a reply brief, the plaintiffs attached five exhibits to their own reply brief on that very issue!

time the motion was first proffered. *See Litton*, 767 F.Supp. at 1235.

■ That is not to say that reply affidavits may raise new evidence. Where new evidence is presented in either a party's reply brief or affidavit in further support of its summary judgment motion, the district court should permit the nonmoving party to respond to the new matters prior to disposition of the motion, *id.*, or else strike that new evidence. But, where the reply affidavit merely responds to matters placed in issue by the opposition brief and does not spring upon the opposing party new reasons for the entry of summary judgment, reply papers—both briefs and affidavits—may properly address those issues. *See id.*

There is no question that the defendants' reply brief and supplemental affidavits do not introduce any new evidence concerning the summary judgment motion. The defendants' response to the motion to strike adequately sets forth the contents of the supplemental affidavits of Mr. Mukamal, Ms. Stott, and Mr. Seager and their relation to the plaintiffs' opposition materials. In short, Mr. Mukamal's affidavit merely introduces additional pages of deposition transcripts to clarify portions of those depositions first submitted by the plaintiffs with their opposition brief. Ms. Stott's affidavit merely contains recalculations of previously submitted building inspection data. Mr. Seager's affidavit was submitted both in reply to the opposition brief on summary judgment and in support of the defendants' own motion to strike. Paragraphs 2 to 4 simply respond to a theory of the plaintiffs first fleshed out in their opposition brief. Paragraphs 5 to 7 of the affidavit and pertinent attached exhibits support the defendants' contention that portions of the opposition documents should be stricken. As these paragraphs are submitted in support of the defendants' own motion, they are proper.

The plaintiffs' motion to strike is thus DENIED.

■ The defendants' motion to strike concerns the affidavits of experts Johnson and Slifka and the exhibits attached to Mr. Johnson's affidavit. The defendants wish to have each affidavit struck in its entirety. Alterna-

tively, they request that certain portions of the Johnson affidavit be struck: the attached figures 13 and 14 and the conclusions drawn therefrom as stated in paragraphs 38 to 43 of the affidavit.

The defendants argue that Mr. Johnson's affidavit should be struck because it

consists largely of information and conclusions which are wholly irrelevant to the issue which must be addressed by the court: whether the Department of Building Inspection initially discriminated in the quantity and quality of inspection services that it provided to the Black community.

Brief in support of motion to strike at 2. The plaintiffs counter that Johnson's affidavit relates not only to intent, but also to the existence of racially identifiable neighborhoods and unequal quality of services in the black community.

The motion will be DENIED in part and GRANTED in part.

■ The entire affidavit is not irrelevant and will not be struck. The affidavit does cover information regarding identification of racially separate neighborhoods, which is an element that the plaintiffs must prove, and the City's alleged history and pattern of discrimination against blacks, which could make it more probable that the City's conduct toward the plaintiffs regarding housing inspection was also discriminatory. Certain portions of the affidavit, however, that neither involve the City's relation to the black community nor have any relationship to building inspections are indeed irrelevant and will be struck: paragraphs 10 (in 1960 low-interest mortgage financing was difficult for blacks to obtain and discrimination in lending still persists); 12 (in the 1960's blacks were discriminated against in manufacturing jobs); 13, except for the first sentence (unions have discriminated against blacks and patterns of employment discrimination have persisted since the 19th century); and 17, first sentence (the police handling of Jeffrey Dahmer suggests that there are two standards of justice), a conclusion that is pure speculation by Mr. Johnson and that is not backed up by any other statement or evidence in the affidavit.

■ Furthermore, the City objects to figures 13 and 14, which are attached to Mr. Johnson's affidavit, because they are unauthenticated and without foundation. Figure 13 is a table that tallies inspector activity in predominantly black areas of Milwaukee. The statistics are in a grid relating the number of inspections conducted by each named inspector for nine different years, with totals for each year at the bottom, along with each inspector's average number of inspections per day and per year. Figure 14 is a similar table tallying inspector activity in the predominantly white areas of Milwaukee.

These figures will be struck. There is no indication in Mr. Johnson's affidavit or on the tables themselves as to where the data was obtained. In the plaintiffs' brief in opposition to the motion to strike, they state that the data comes from "the City's database." Even that is not a specific enough indication of the data's source. And, the plaintiffs have provided no verification that the data indeed came from the City's database. Unlike the defendants' exhibits to the summary judgment motion, the plaintiffs have filed no computer printout of the hard data on which these summaries are based. Moreover, Schuyler Seager's affidavit and attachments in support of this motion to strike show that the data in the tables is unreliable. According to the affidavit, the pertinent portions of the computer database contain no inspectors' names. And, according to the attachments, which are pages from several named inspectors' personnel files, the tables contain data for several inspectors for years that they were not even employees. For instance, Karen Jacobs started work as an inspector in 1991, but the tables contain statistics for her for 1980 and 1983 to 1990. The same type of problem is true for 7 out of the remaining 24 inspectors.

The plaintiffs try to avoid having these figures struck by saying that it is not their fault the data is unreliable because they found the data in the City's own database. But, without any specification as to the location of the hard data from which these totals were calculated—let alone any attached computer printout of the hard data to back up this excuse—the tables have no value in the search for the true facts of this case. The conclusions that Mr. Johnson draws in paragraphs 38 to 43, even if related to figures 13 and 14, will remain, however, since the conclusions drawn from the data in the computer database are entwined with other information as well.

■ The City next requests that Slifka's affidavit be struck as irrelevant because the opinion expressed is that the City was "deliberately indifferent" to its poor residents, while the legal standard to be applied is whether the City intentionally discriminated against the plaintiffs because of their race. This request is DENIED. All relevant evidence is admissible, Federal Rule of Evidence 402, and the standard for relevance is quite low. It merely requires that the evidence have a "tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed.R.Evid. 401. While Mr. Slifka's affidavit may not prove intentional discrimination on its own, when combined with both Mr. Johnson's opinion that the majority of poor in Milwaukee are black and the fact that the plaintiffs are black, Mr. Slifka's opinion is easily deemed relevant. While not glaringly persuasive, the opinion does make the possibility of intentional discrimination more probable. Additionally, the affidavit touches upon what Mr. Slifka thinks would have happened if a smoke detector had been installed at 1738 North 23rd Street. These opinions are relevant to determining proximate causation, an issue raised by the defendants in their motion.

### Motion for Summary Judgment

#### A. Summary Judgment Standard

Summary judgment should be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The adverse party may not rest upon the mere allegations of the pleadings, but "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). I must draw all reasonable inferences from

the materials before me in favor of the non-moving party. *Johnson v. Pelker,* 891 F.2d 136, 138 (7th Cir.1989). Summary judgment is proper against a plaintiff who fails to establish an essential element of his claim on which he will bear the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986).

### B. Section 1983 Claim

#### 1. Individual and Municipal Liability

■ To sustain any claim brought pursuant to section 1983, a plaintiff must prove that: (1) the plaintiff holds a constitutionally protected right; (2) a deprivation of the right occurred; (3) defendants intentionally caused the deprivation; and (4) defendants acted under color of law. *Donald v. Polk County,* 836 F.2d 376, 379 (7th Cir.1988).

■ Ms. Maglio has been sued in her individual capacity. She can therefore only be liable for her individual wrongdoing. *Duckworth v. Franzen,* 780 F.2d 645, 650 (7th Cir.1985). When an equal protection violation is alleged against an individual, the plaintiff must allege and prove that the individual herself intentionally discriminated due to an impermissible classification such as race. *Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976).

■ In addition to suing the City, the plaintiffs have named Milwaukee's present mayor, John Norquist, Commissioner of Building Inspection Lee Jensen, and (former) Common Council President Thomas Donegan [5] in their official capacities. To hold a municipality and an individual in his official capacity liable, a plaintiff must also prove a fifth element: that the constitutional deprivation was caused by "a policy statement, ordinance, regulation or decision officially adopted and promulgated by [the City's] officers." *Monell v. New York City Dept. of Social Services,* 436 U.S. 658, 690, 98 S.Ct. 2018, 2036, 56 L.Ed.2d 611 (1978); *Sims v. Mulcahy,* 902 F.2d 524, 538 (7th Cir.1990).

A municipality thus cannot be held liable under 42 U.S.C. § 1983 on a *respondeat superior* theory. *Monell,* 436 U.S. at 690, 98 S.Ct. at 2035. In this case, these elements have the following characteristics.

■ The plaintiffs hold a constitutionally protected right. The fourteenth amendment states in part: "nor shall any state ... deny to any person within its jurisdiction the equal protection of the laws." The equal protection clause prohibits discrimination in the provision of public services by the government. *See Yick Wo v. Hopkins,* 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886). A state or its subdivisions may not selectively deny protective services to minorities without violating the equal protection clause. *DeShaney v. Winnebago County Dept. of Social Services,* 489 U.S. 189, 197 n. 3, 109 S.Ct. 998, 1004 n. 3, 103 L.Ed.2d 249 (1989).

■ The plaintiffs' case focuses on the denial of equal housing inspection and code enforcement services based on race. The parties agree that to prove a deprivation of equal protection based on the denial of equal services, the plaintiffs must demonstrate (1) the existence of racially identifiable neighborhoods; (2) substantial inferiority in the quality or quantity of the municipal service; and (3) discriminatory intent or motive. *Alexander v. Chicago Park District,* 709 F.2d 463, 467–68 (7th Cir.1983). Proof of disproportionate impact alone is insufficient to prove an equal protection violation. *Arlington Heights v. Metropolitan Housing Dev. Corp.,* 429 U.S. 252, 264–65, 97 S.Ct. 555, 562–63, 50 L.Ed.2d 450 (1977). So, even assuming that a plaintiff can prove disparate impact, he or she must also demonstrate that the substantial inferiority in the services was the result of a discriminatory intent or purpose. *Id.* at 269 n. 19, 97 S.Ct. at 566 n. 19.

There is no question that if the defendants in this case are shown to have caused such a deprivation, they were acting under color of law.

**5.** Mr. Donegan is now a Milwaukee County circuit court judge. He is also married—since June 27, 1992—to Judy Davis Spangler Donegan, my senior law clerk since 1980. Because Judge Do-

negan is only named as a defendant in his former capacity as the president of the 16–person City of Milwaukee Common Council, I do not deem it necessary that I recuse myself from this case.

The plaintiffs' amended complaint alleges that the Department had a policy of discriminating against the City's black community. As fleshed out in their opposition brief, their allegations break down into two distinct, allegedly discriminatory policies. The first is that the City had a policy of giving inferior inspections in the "black community" as opposed to the "white community." The second is that the City's policy of not strictly enforcing the smoke detector ordinance—instead requesting "voluntary compliance"—discriminated against the black community.

### 2. Analysis

#### a. Ms. Maglio

In regard to Ms. Maglio, the plaintiffs have not alleged anything specifically against her. Although the caption names her individually, no allegations in the amended complaint actually state that she is being sued in her individual capacity. All allegations of intentional discrimination are against the defendants generally and are alleged in conjunction with the furtherance of a discriminatory policy. The amended complaint never asserts that Ms. Maglio discriminated against Ms. Phillips on the basis of race or that Ms. Maglio inspects the homes of white citizens differently than she does the homes of black citizens. The only allegation against Ms. Maglio is that because of the defendants' policy of discriminating in the quality of inspection services within the black community, she failed to note the absence of smoke detectors. This allegation is insufficient to support a claim against Ms. Maglio in her individual capacity. The amended complaint must be dismissed against her.

In addition, even if a claim is stated against her individually, she is entitled to summary judgment. In the face of her statement that she did not engage in intentional discrimination, the plaintiffs have proffered nothing to the contrary. The voluntary compliance policy was one of the Department, not of Ms. Maglio. All that the plaintiffs have pointed to in support of their claim of discrimination against her individually is that on September 8, 1987, when she performed her inspection at 1738 North 23rd Street, she failed to note a violation of the code. Even if true, this one failure does not establish any intentional discrimination since her finding of 23 other violations rebuts any inference of intentional discrimination.

#### b. The Inspection "Policy"

The plaintiffs argue that the City had a policy of providing inferior inspections in the black community, with the result that during Ms. Maglio's September 8, 1987, inspection of the house on 23rd Street, she failed to note the absence of a smoke detector and failed to inform either Ms. Phillips or Mr. Echols of the need for one. Allegedly as a result, no smoke detector, which possibly may have saved the house's occupants, was installed.

The plaintiffs have failed to prove any policy of discrimination against the black community in regard to housing inspections. Whether or not the September 8, 1987, inspection of Ms. Phillips's home was performed discriminatorily, at most the plaintiffs can show only this single incident in support of their "policy". The plaintiffs have not contended that Ms. Maglio was in any way a policymaker. And, they have not established that any other one- or two-family dwelling received a discriminatory inspection.

Furthermore, they have not shown enough evidence on all essential equal protection deprivation elements to survive summary judgment. Much of the plaintiffs' evidence focuses on the element of identification of racially distinct neighborhoods, an element on which the plaintiffs can easily survive summary judgment, if not win themselves. The other two elements, though, have not been adequately supported.

Both sides have presented data and illustrative maps showing that the city of Milwaukee is segregated by race. The City's data and maps are based on 1985 and 1990 census data. (In 1985, the United States Bureau of the Census conducted a special census for the city of Milwaukee.) The city is broken down into 218 census tracts. City Senior Planner Mary Stott has summarized the data as to what type of majority population each census tract has. According to Ms. Stott, under the 1985 census, there were 60 census

tracts with a black majority. All but 3 tracts had a true majority of 50 percent or more. (Ms. Stott rounded up 49.5 percent or greater and considered it as 50 percent or greater). In the remaining 3 tracts (tracts 26, 135, and 145), blacks constituted the majority with between 47.2 percent and 49.4 percent of the population. White citizens constituted the majority in 154 census tracts, while 4 census tracts had an Hispanic majority. Under the 1990 census, there were 72 census tracts with a black majority. Again, in 3 of those tracts blacks constituted a majority with less than 49.5 percent of the population (tracts 114, 123, and 134). One hundred forty tracts had a white majority, while 6 tracts had an Hispanic majority. In 1 of the 6 Hispanic tracts, the majority was held with 48.0 percent of the population being Hispanic.

Ms. Stott created color-coded census tract maps to depict the locations of the majority tracts for each census year. Photocopies of her maps are attached as appendix A to this opinion. The data and maps show that all the majority black tracts are clustered together in the north central part of the city.

The plaintiffs' data and maps vary only slightly. The plaintiffs' expert, James H. Johnson, has divided the 218 census tracts in the city into three racially distinct areas: the "white area", the "reinvestment area", and the "core black area." Although he does not explicitly state what year his statistics are based on, it appears that Mr. Johnson has used First Wisconsin National Bank's Community Investment Corporation data from 1980. According to Mr. Johnson, the white area consists of 96 census tracts, only two of which have over a 26 percent black population. The reinvestment area is comprised of the other 122 census tracts, incorporating the predominantly minority areas, which were

targeted for business ventures. The reinvestment area is racially mixed, but encompasses the core black area. Whites and other nonblacks generally live near the borders of the reinvestment area. The core black area consists of 48 census tracts, all on the city's north side, in which blacks constitute more than 65 percent of the population.[6] According to Mr. Johnson's affidavit, 40 of these tracts are over 75 percent black. The core black area is bounded by Villard Avenue and Capitol Drive on the north, Juneau Avenue on the south, 35th Street and Sherman Boulevard on the west, and Holton Street and the Milwaukee River on the east. According to Mr. Johnson, in 1985 blacks constituted 28 percent of the city's overall population.[7] Eighty-five percent of all blacks in the city (i.e., 23.8 percent of the total city population)[8] reside within the core black area, which constitutes 22 percent of the city's total area. Copies of the maps on which Mr. Johnson relies are attached to this opinion as appendix B.

Although the plaintiffs try to make an issue of whether it was proper for Ms. Stott to consider 49.5 percent or greater a majority rather than 51 percent or greater, there really is no factual dispute here.[9] I think it safe—and sad—to say that Milwaukee is a highly segregated city. Even the City's data shows readily identifiable neighborhoods based on race. The statistics and maps clearly show that the black population is for the most part confined to the north side. As the City's data was taken closer to the time of the 1987 fire, I will use its data. In any event, the only real difference between the 1980 and 1985 black population statistics is that in 1985 the black area had expanded slightly to the west and south. The 1990

---

6. The residence located at 1738 North 23rd Street, at which the fire in this case occurred, is situated within the core black area in census tract 119.

7. Ms. Stott's data shows the black population to be 25.3% of the total in 1985. Whites made up 71.9% of the total. To give the plaintiffs the benefit, though, I will use Mr. Johnson's data on this point.

8. It is not quite proper to mix up these statistics from 1980 and 1985, but that is what Mr. Johnson has done, and he has given no information on the percentage of blacks in the city population in 1980.

9. In her supplemental affidavit, Ms. Stott recalculated several statistics using 51 percent rather than 49.5 percent as a majority. The summarized data barely changes, and the resulting conclusions are no different after the recalculations.

statistics show a much greater enlargement of the black majority areas to the west.

Unfortunately for the plaintiffs, they have not established any question of material fact regarding whether the black community received substantially inferior building inspections in either quantity or quality and whether there existed any discriminatory intent or motive. They have not adequately articulated how inspections differed between black homes and white homes to the detriment of the black community, or, assuming that there were differences, that the inferiority was intentional.

The City contends that it was its policy to respond to all requests for inspections in the same manner, regardless of race. The City has proffered the affidavit of Schuyler Seager, administrator of the code enforcement section, who stated that when the Department received a request for an inspection, it did not inquire as to the race of the person. The City also claims that it was the Department's and code enforcement section's policy to perform all inspections in the same manner and to enforce the code irrespective of race.

The statistical data submitted by the City, which for the most part is not disputed by the plaintiffs, establishes that the Department did not discriminate in the quantity of services it rendered to the black community.[10] To the contrary, per household and per person, the quantity of services provided by the Department to the identified black neighborhood was far greater than in the white neighborhoods.

In regard to population, the white community was about 2.6 times the size of the black community under the 1985 census[11] and approximately twice as large as the black community under the 1990 census.[12] There were 3 to 4 times as many structures in the white community as in the black community. Yet, consistently between 1984 and 1988, more inspections were performed in the black community than in the white community. Far more citizen-complaint-generated inspections were performed in the black community as well during that time period. And, the number of violations cited in the black community—both total and per structure—was almost twice the number cited in the much-larger white community. Actual statistics are attached to this opinion as appendix C.

The plaintiffs admit that from 1985 to 1990 the number of inspections in the white and core black areas were approximately equal even though the white area contained 96 tracts and the core black area only 48. But, they attempt to establish a material issue of fact on this point by arguing that these statistics alone do not show that the City serviced the core black area more than the white area. According to Mr. Johnson,

---

**10.** The statistical data was demographically compiled and analyzed by Ms. Stott, a senior planner with the Department of City Development, Comprehensive Planning Division. Ms. Stott analyzed the Department's data from January 1984 to July 1990. The data has been grouped into three summary periods: January 1984 to July 1986; July 1986 to July 1988; and July 1988 to July 1990. The plaintiffs have objected to the use of data coming from dates subsequent to the fire. I agree that any statistics after September 30, 1987, have no place in or bearing on this case. The statistics covering July 1988 to July 1990, then, will be thrown out. For practical purposes, it is impossible for me to split up the July 1986 to July 1988 time period, and neither party has come forth with statistics running just to September 30, 1987. So, because July 1986 to September 30, 1987 is more than half of the July 1986 to July 1988 time period, I will use the statistics from that period in reaching my decision. This use of the statistics seems fair since the data over each of the 2-year periods presented by the City remains rather constant.

**11.** This comes from a combination of the following calculations:

439,328 (whites) − 28,041 (double-counted Hispanics) = 411,287

$$\frac{411{,}287 \text{ (whites)}}{154{,}813 \text{ (blacks)}} = 2.657$$

*See* defendants' exhibit 14 at 5. A similar number is reached by using the population percentages provided by Ms. Stott and Mr. Johnson:

$$\frac{.719 \text{ (whites)}}{.28 \text{ (blacks)}} = 2.568$$

*See* Stott supplemental affidavit at ¶ 11 and plaintiffs' exhibit A (Johnson affidavit) at ¶ 8.

**12.** The white population constituted 63.3 percent of the city's total, while blacks made up 30.5% of the total. *See* Stott supplemental affidavit at ¶ 11.

[t]hose figures only show that the core black area produced more complaints, which in turn resulted in more inspections. Moreover, the dilapidated condition of the housing in the Core Black Area necessarily requires more inspections than does the White Area. One simply cannot compare the number of inspections in the two areas without controlling for the difference in the age and quality of the housing stock.

Johnson affidavit at 11–12.

Yes one can. Nothing in the equal protection clause protects those who are discriminated against because they live in old, or wooden, or dilapidated housing, or houses with several occupants. The equal protection clause protects those who are discriminated against because of their *race*. The City's summarized data clearly shows that for only having 28/30.5 percent (1985 versus 1990) of the city population, for having 18.6/19.6/24.6 percent [13] of the one- and two-family residences, and for only constituting the majority in 27.5/33 percent (1985 versus 1990) of the city's tracts, the black area received 53/56/58 [14] percent of the one- and two-family dwelling inspection services. The fact that the citizens of that area requested *and received* more inspections helps the defendants' case, not the plaintiffs', because it shows that the code enforcement section did not ignore the black community but rather responded to its complaints.[15]

In regard to the quality of inspections in the black area, Mr. Johnson states that "the deposition of Pandora Bender reveals that the less experienced inspectors were assigned to the Core Black Area, while those with more seniority were allowed to choose the less busy White Area. As a result, the quality of inspections necessarily suffered." Plaintiffs' ex. A (Johnson affidavit) at ¶ 38. First of all, the plaintiffs have shown nothing that equates less experienced inspectors with lower quality inspections. Second, Mr. Johnson's statement inaccurately summarizes the testimony of Ms. Bender, the City's assistant supervisor of building inspections.

Ms. Bender's deposition transcript of August 20, 1992, and Mr. Seager's deposition of February 25, 1992, show that Mr. Johnson's conclusion is wrong in regard to where senior inspectors were assigned. Inspectors, by seniority, were given the choice of which districts they wished to work. If any district had not been chosen, managers would make the decision as to who would go there.

Q. Can you tell me how many inspectors have chosen to work in the northside in the last five or six years? ... I'll refer to what the City has defined in their ... moving papers in support of their motion for summary judgment as the census tracts with black majorities. How many inspectors have chosen to work in those areas?

A. I would say probably almost all of them, all of them who have worked there.

. . . .

Q. Is it accurate to say that generally the less experienced inspectors are assigned to the inner city?

A. No.

Mukamal affidavit, ex. B (Seager deposition) at 9, 12.

Q. Okay. So the question, I guess the point I'm trying to ask you is the most senior blacks are now assistant supervisors?

A. Yes.

Q. In the next level down, the front line or the actual code enforcement inspectors, the ones who are senior enough to basically choose the areas that they go to—that is right, still seniority?

A. Yes.

Q. —as far as you are aware, do they choose to go to the predominantly black neighborhoods? And I'm speaking of the black inspectors.

**13.** These statistics correspond to appendix C, parts 1, 2, and 3, respectively, by dividing the number of structures in the black majority tracts by the total number of structures.

**14.** Again, these statistics correspond to appendix C, parts 1, 2, and 3.

**15.** In her supplemental affidavit, Ms. Stott resummarized the City's data for those census tracts making up the core black area as designated by the plaintiffs. The recalculated data leads to the same conclusion, however. That summarized data is noted in appendix D.

A. Yes.

Mukamal affidavit, ex. A (Bender deposition of 8/20/92) at 22–23.

The plaintiffs argue that the inspectors in the black neighborhood had more work to do than those in the white neighborhoods and therefore could spend less time and care per household in the black area, but they have no proof to back up the argument—again in the face of evidence pointing the opposite direction. At her deposition, plaintiffs' counsel asked Ms. Bender:

Q. In your experience, is there more work, more inspections in the black neighborhoods than in the predominantly white neighborhoods?

A. No.

Q. In your experience, are there the same number of citizen complaints in the predominantly white neighborhoods as are in the predominantly black neighborhoods?

A. Basically equal.

*Id.* at 23.

Furthermore, undisputed data and summaries presented by the City show that between 1984 and 1988, the number of violations cited per structure in the black community was approximately twice the number of violations cited per structure in the white community. *See* appendix C. Sixty-three to 69 percent of the total number of violations cited by the Department were in the black area. This data implies that the Department did indeed take into account the poorer quality of housing in the black community and accordingly demanded that building owners make more improvements.

The plaintiffs throw in some irrelevant statistics to try to survive summary judgment on this inspection issue. For instance, they submit that 53 percent of the city's fire deaths occurred in the core black area. With the exception of the house at 1738 North 23rd Street, there is no evidence that any of these deaths occurred in residences that the Department had inspected. There thus is no evidence that those deaths resulted from inferior inspections. The plaintiffs also toss in

the statistic that despite the fact that more than half the city's fires occur in the core black area, that area contained only 30 percent of the fire stations, yet the quality of fire fighting is not at issue in this case at all.[16] All these irrelevant statistics do not help the plaintiffs' case. In sum, undisputed evidence establishes that neither the quantity or quality of inspectional services was unequal between the black and white communities.

Finally, the plaintiffs have not established any factual question in regard to intent. Because the allocation of inspection services is triggered by the citizen, for plaintiffs to show intent they would have to prove that the City had a policy of refusing to respond to requests from black citizens and that the policy was motivated by race. The plaintiffs have not submitted any evidence to show that inspection requests by blacks or from areas of the city where many blacks live were not honored. Also, as stated above, the fact that even though more requests were made by the black community more inspections also occurred there negates any inference of intentional discrimination.

Proffered statistics and conclusions relating to the placement of fire stations, school dropout rates, and income are irrelevant to the issue of whether the Department purposefully treated inspection requests from black homes any differently than requests received from white homes. In their attempt to establish a factual question, plaintiffs also present these statements by Mr. Johnson:

Because the figures regarding racial demographics, housing conditions, and fire deaths were either publicly available or compiled by the City itself, the City must have known that overloading the inspectors in the Core Black Area would result in fewer smoke detectors, more fires, and more fire deaths in the Core Black Area than in the White Area.

. . . .

Because of the history of discrimination in Milwaukee, the degree of disparity be-

---

**16.** As the City notes, looked at another way the core black area had more than its proportionate share of fire stations. The core black area makes up 22 percent of the city's census tracts and in 1985 contained 28 percent of the population, yet had 30 percent of the fire stations.

tween the quality of inspection services and fire deaths in the Core Black Area as compared to the White Area, the City's knowledge that its inspection practices and enforcement policy would result in substantially more fires and fire deaths in the Core Black Area, and the failure of the City's policies to further any stated governmental purpose, I believe discriminatory intent played some role in the City's allocation of inspection resources and its policy of voluntary compliance.

These statements are simply unsubstantiated. As shown above, the plaintiffs have not presented any evidence to show that inspectors were overloaded in the black area, that the quality of inspection services suffered, or even that a policy of poor inspection services existed. Without any basis in fact, Mr. Johnson's statement cannot be used to create an issue of fact that just does not exist.

c. The Code Enforcement Policy

■ The City admits that it was the policy of the Department to not issue an order against a tenant for violating code section 250–12 by failing to have a smoke detector installed. Seager affidavit, ¶ 14. It was the policy of the Department to instead counsel the tenant on the code requirement and the need for a smoke detector in an effort to seek voluntary compliance.

According to the City, there were two main reasons underlying the policy of seeking voluntary compliance. First, the minimum penalty triggered by the issuance of an inspector's order against the violator was far more costly than the price of a smoke detector. Seager affidavit at ¶ 15. The goal of the Department and the ordinance was for the tenant or owner to actually install a detector as soon as possible rather than collecting a penalty through a protracted legal action. The Department felt that the goal of the ordinance was more likely to be achieved through voluntary compliance. Seager affidavit at ¶ 15. Because the Department and code enforcement section were more concerned with correcting violations rather than assessment of penalties, the inspectors were encouraged to work with owners to achieve compliance with the code in lieu of prosecution. Second, if an order was written against

the tenant, it was the experience of the code enforcement section that the tenant would not allow the inspector access to the premises for reinspection to check compliance with the order. Without judicial intervention, the inspector could only gain access to the premises by consent. Wis.Stat. § 66.122; Seager affidavit at ¶ 15. If the inspector was not allowed access upon reinspection, the Department was not only unable to prove that the smoke detector order had not been complied with, but the inspector was impaired in investigating whether other violations had been corrected by the owner.

Although the policy of the Department was to seek voluntary compliance with section 250–12, that policy did not prohibit an inspector from writing a citation if the inspector felt that an order was warranted. Seager affidavit at ¶ 16. According to the City, it was not the Department's policy to write orders only against white persons and not black persons; nor was its policy to counsel only white people and not black people. Seager affidavit at ¶ 17. The policy was to seek voluntary compliance by all citizens, regardless of race, and to counsel all citizens regardless of race. Seager affidavit at ¶ 17.

The plaintiffs have presented nothing but outlandish argument on the discrimination element. The plaintiffs argue that this voluntary compliance policy (rather than strict enforcement by fining) was discriminatory against the black community because the poor (who they say are generally black) did not have enough incentive to comply. They contend that *if* they had been slapped with a substantial penalty for not having a smoke detector installed, *then* they would have installed them. The faultiness of the plaintiffs' argument becomes readily apparent when their argument is flipped around. Had the City enforced a strict policy whereby inspectors had no choice but to fine the occupants for a smoke detector violation, I can imagine a civil rights case upon these same facts with the argument that because the poor cannot afford both the fine *and* the smoke detector and because the majority of the poor in Milwaukee are black, that policy, too, would

discriminate against blacks. (In fact, that is a *better* argument than the one before me.) [17]

In their opposition brief, the plaintiffs argue that the voluntary compliance policy produced situations where inspectors, because they were not required to issue citations for missing smoke detectors or note their absence, *might* have overlooked their absence. "Might" is the key word here; this argument is pure speculation. But even if this contention proved true, such a failure would occur across the board, not just against the black community.

No evidence at all has been presented by the plaintiffs showing that the Department's policy discriminated against the black community. Nothing has been presented to show, for instance, that the voluntary compliance policy resulted in greater risk to life than strict enforcement would have, and that that resulting risk was greater in the black community due to racial factors rather than housing structure.

The Department's policy of counseling tenants about the ordinance and suggesting voluntary compliance was clearly rational. It made sense. The goal of the City was to get smoke detectors installed. Why fine someone who has little money several times the cost of a smoke detector, when that person has a hard time affording the smoke detector let alone a fine plus the smoke detector? To pay the fine would be taking away from money that could be put toward one or possibly additional smoke detectors and could actually delay better protection because of the cost involved.

The only evidence that the plaintiffs proffer to the contrary are the statements of their expert, Michael J. Slifka, a registered professional fire protection engineer:

> The City of Milwaukee Building Department practice of seeking voluntary compliance and counselling of occupants to meeting the city's smoke detector ordinance

assured that the more economically disadvantaged would have no impetus to install smoke detectors. Thus the level of fire risk to the poor would continue unabated and the difference in level of risk between the poor and the more economically capable would continue to widen with the highest risk being found with the poorest of individuals.

Plaintiffs' ex. G (Slifka affidavit) at ¶ 3g. How Mr. Slifka arrived at this conclusion is unclear, as it is backed up by no data or substantiation whatsoever. Moreover, it does not prove that the black community was discriminated against because of race. At most, it merely shows that the City may have committed economic discrimination; but there just is no protection for the poor—as a class—under the fourteenth amendment. Mr. Johnson's statement that the poor in Milwaukee are mostly black could help to show that there was some disparate impact against some blacks, but the link is too tenuous to survive summary judgment. The plaintiffs just cannot show disproportionate impact against the poor blacks as opposed to poor whites or poor Hispanics or poor Asians.

The plaintiffs' real dispute is not with the policy of enforcement of the ordinance. The dispute is really with the ordinance itself, as is indicated by Mr. Slifka's affidavit:

> A prudent governmental body would have reviewed the model smoke detectors ordinance proposal ..., would have developed an ordinance directed at property owners and at those economically capable of assuring that smoke detectors would be installed throughout the housing base in Milwaukee. To do otherwise represents deliberately indifferent action on the part of the City of Milwaukee. It produced an ordinance that was discriminatory against the segment of population that has the highest fire risk, the poor of Milwaukee.

---

**17.** The plaintiffs' argument is disturbing because to use it, the plaintiffs must admit their ignorance or intentional disregard for the law and for their own safety. They are, in essence, saying "On our own we are too irresponsible to buy a smoke detector, even though we are knowingly violating the law and endangering our families, and we'll spend our money on other things. But, if you fined us $100 each, we would suddenly have some incentive and would comply with the law." While Ms. Phillips has stated that this was true for her, the general presumption that blacks do not adhere to municipal ordinances while whites do is suspect.

Plaintiffs' ex. G (Slifka affidavit) at ¶ 3f. Yes, it likely would have been better for poor, black tenants to have been provided smoke detectors by their landlords. Yes, it would have been even better if the City had provided smoke detectors free of charge. But that was not the law, and the ordinance itself has not been challenged, nor could it be successfully challenged as constitutionally infirm in this case.

The plaintiffs have not shown any issue as to discriminatory intent in regard to this policy, either. Ms. Maglio has stated that if she did not counsel Ms. Phillips about the smoke detector, the failure to counsel was not based on race, but was an oversight. Maglio affidavit at ¶ 16. As before on the inspection issue, Mr. Johnson's above-quoted statement is all that the plaintiffs have provided on the intent topic and it is not enough to survive this summary judgment motion.

Moreover, in 1987 there was no state requirement for smoke detectors in one- and two-family residences. Yet, by enacting section 250.12, the City required smoke detectors in those residences. How an additional concern for safety can by itself form a basis for a claim of intentional discrimination is mysterious.

### C. Section 1981 Claim

■ Section 1981 states in part:

All persons shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and

to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens. . . .

As is true under section 1983, a municipality cannot be held liable under a *respondeat superior* theory. *Jett v. Dallas Independent School Dist.*, 491 U.S. 701, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989). Also like section 1983, section 1981 requires proof of purposeful, intentional discrimination. *General Bldg.*

*Contractors Ass'n v. Pennsylvania*, 458 U.S. 375, 102 S.Ct. 3141, 73 L.Ed.2d 835 (1982).

As was shown above, the plaintiffs have not shown that any genuine issue of material of fact exists on the issues of policy, discrimination, and intent or that the defendants are not entitled to summary judgment as a matter of law.

### D. Remaining Arguments and Claims

Because the above analysis disposes of this case, the defendants' proximate causation arguments need not be addressed. I note, however, that the plaintiffs would have a difficult time surviving that issue as well.

Although not pursued in the opposition brief, various other claims were thrown into the amended complaint in this case. For instance, in one conclusory allegation, the plaintiffs claim that they were denied access to the courts by the City's failure to advise them of the actual cause of the fire. As the defendants' challenge to many of these remaining allegations has not been rebutted by the plaintiffs and these various claims seem to have been abandoned, they are DISMISSED.

■ Included in these remaining claims are several that, in an order of October 17, 1989, I recognized as untenable substantive due process claims "thinly disguised." In their amended complaint, the plaintiffs allege that they have been denied adequate housing, funds, and services.[18] Citizens possess no right under the due process clause to adequate municipal services. The due process clause does not confer an "affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty or property interests of which the government itself may not deprive the individual." *DeShaney*, 489 U.S. at 196, 109 S.Ct. at 1003. It is tragic that 12 people died in the fire at 1738 North 23rd Street; but the result cannot be to hold the City liable for failing to protect its citizens, including Ms. Phillips's household, from that danger.

---

18. Some of the plaintiffs' proffered evidence goes to these unavailable claims as well. *See, e.g.,* plaintiffs' ex. G (Slifka affidavit) at ¶ 3i ("The City of Milwaukee, by enforcing the smoke detector ordinance through voluntary compliance . . . , emasculated the ordinance and, consequently, it had no impact on improving the level of fire risk amongst the poor in Milwaukee.").

ACCORDINGLY, IT IS ORDERED that the defendants' motion for summary judgment is GRANTED, any remaining claims are DISMISSED, and this entire case is hereby DISMISSED.

## APPENDIX A

APPENDIX B

% Blacks by Census Tract
City of Milwaukee, 1980

0%
26% - 50%
51% - 75%
> 75%

Community Investment
Corporation Target Area

Source. Designed and compiled from 1980 U.S. census data by Prof. Walter Farrell and Mr. George Tiggs.

# Community Investment Corporation
# Target Area (FWNB):

% Blacks by Census Tract
City of Milwaukee, 1980

0% - 25%
26% - 50%
51% - 75%
> 75%

Community Investment
Corporation Target Area

> 65% Black

Source: Designed and compiled from 1980 U.S. census data by Prof. Walter Farrell and Mr. George Tiggs

FIGURE 3

Community Investment Corporation
Target Area
(FWNB)
City of Milwaukee, 1980

Community Investment
Corporation Target Area

Source   Designed and compiled from 1980 U S census data by Prof  Walter Farrell and Mr  George Tiggs

Community Investment Corporation
Target Area(FWNB)
City of Milwaukee, 1980

Milwaukee River

Silver Spring In.

Lincoln Ave.

35-43d Strive

——— Community Investment
Corporation Target Area
——— > 65% Black

Source   Designed and compiled from 1980 U.S. census data by Prof. Walter Farrell and Mr  George Tiggs

FIGURE 4

**1) TIME PD 1984-1986 1 & 2 FAMILY UNITS USING 1985 CENSUS DATA**

| | Total No. of Tracts | % of Total Tracts | Total No. of Structs. | % of Total Structs. | Total No. of Bldgs. Insp. | % of Bldgs. in Area Insp. | Total No. of Viols. Cited | Ave. # of Citations Per Struct. | % of Total Viols. | Total No. of Insp. | % of Total Insp. | Complaint Generated Insp. | % of Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Black Maj. Tracts | 60 | 27% | 26825 | 19% | 7959 | 29% | 106730 | 13.41 | 63% | 18107 | 53% | 9270 | 57% |
| White Maj. Tracts | 154 | 71% | 116105 | 80% | 9153 | 7% | 58167 | 6.35 | 35% | 15650 | 45% | 6794 | 41% |
| Hispanic Maj. Tracts | 4 | 2% | 1252 | 1% | 316 | 25%* | 3431 | 10.86 | 2% | 725 | 2% | 339 | 2% |
| TOTAL | 218 | 100% | 144182 | 100% | 17428 | 12%* | 168328 | 9.66 | 100% | 34482 | 100% | 16403 | 100% |

**2) TIME PD 1986-1988 1 & 2 FAMILY UNITS USING 1985 CENSUS DATA**

| | Total No. of Tracts | % of Total Tracts | Total No. of Structs. | % of Total Structs. | Total No. of Bldgs. Insp. | % of Bldgs. in Area Insp. | Total No. of Viols. Cited | Ave. # of Citations Per Struct. | % of Total Viols. | Total No. of Insp. | % of Total Insp. | Complaint Generated Insp. | % of Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Black Maj. Tracts | 60 | 27% | 26096 | 20% | 8024 | 30% | 117254 | 14.61 | 65% | 17838 | 56% | 9496 | 59% |
| White Maj. Tracts | 154 | 71% | 105487 | 79% | 8179 | 7% | 59942 | 7.33 | 33% | 13613 | 42% | 6393 | 39% |
| Hispanic Maj. Tracts | 4 | 2% | 1227 | 1% | 295 | 24%* | 4269 | 14.47 | 2% | 612 | 2% | 320 | 2% |
| TOTAL | 218 | 100% | 132810 | 100% | 16498 | 12%* | 181465 | 11.00** | 100% | 32063 | 100% | 16209 | 100% |

**3) TIME PD 1986-1988 1 & 2 FAMILY UNITS USING 1990 CENSUS DATA**

| | Total No. of Tracts | % of Total Tracts | Total No. of Structs. | % of Total Structs. | Total No. of Bldgs. Insp. | % of Bldgs. in Area Insp. | Total No. of Viols. Cited | Ave. # of Citations Per Struct. | % of Total Viols. | Total No. of Insp. | % of Total Insp. | Complaint Generated Insp. | % of Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Black Maj. Tracts | 72 | 33% | 32639 | 25% | 9052 | 28% | 125951 | 13.91 | 69% | 19703 | 58% | 10428 | 64% |
| White Maj. Tracts | 140 | 64% | 98197 | 74% | 6908 | 7% | 48943 | 7.08 | 27% | 11287 | 38% | 5182 | 32% |
| Hispanic Maj. Tracts | 6 | 3% | 1974 | 1% | 538 | 27%* | 6571 | 12.21 | 4% | 1073 | 4% | 599 | 4% |
| TOTAL | 218 | 100% | 132810 | 100% | 16498 | 12%* | 181465 | 11.00** | 100% | 32063+ | 100% | 16209 | 100% |

\* Average rather than total.
\*\* The City's tables showed this average as 10.99, but my calculations show that the number should have been rounded up.
+ For some reason, the City's table incorrectly reflected the total as 8759.

CORE BLACK AREA STATISTICS

(48 tracts with black population of 65 per cent or more)
(compare with data in appendix C)

| | % of 1 & 2 Family residences Inspected | Total No. of Viols. Cited | Ave. No. of Citations Per Structure | % of Total Violations | Total No. of Inspections | % of Total Inspections | Complaint Generated Inspections | % of Total Complaint Generated Inspections |
|---|---|---|---|---|---|---|---|---|
| time pd. 1984-1986 using 1985 census data | 31% | 94,933 | 13.75 | 56% | 15,848 | 45% | 8,284 | 51% |
| time pd. 1986-1988 using 1985 census data | 33% | 102,499 | 14.66 | 56% | 15,684 | 49% | 8,431 | 52% |
| time pd. 1986-1988 using 1990 census data | 30% | 116,801 | 14.42 | 64% | 17,950 | 56% | 9,555 | 58% |