41 F.3d 1510
 NOTICE: Seventh Circuit Rule 53(b)(2) states unpublished orders shall not be cited or used as precedent except to support a claim of res judicata, collateral estoppel or law of the case in any federal court within the circuit.
 Albert BAUGH, individually and as special co-administrator
of the estates of Tremain Baugh, Sharonda Baugh, Shatoya
Baugh, Tyrone Baugh and Varnessa Baugh, Lue E. Roby,
individually, Ethel Huffman, as special co-administrator of
the estates of Tremain Baugh, Sharonda Baugh, Shatoya Baugh,
Tyrone Baugh, Varnessa Baugh, et al., Plaintiffs-Appellants,
v.
CITY OF MILWAUKEE, a municipal corporation at 200 East Wells
Street, Milwaukee, WI 53203, John Norquist, in his official
capacity as mayor of the City of Milwaukee, Lee C. Jensen,
individually and officially as Commissioner of Building
Inspections, et al., Defendants-Appellees.
 
 No. 93-3379.
 United States Court of Appeals, Seventh Circuit.
 Argued March 30, 1994.
Decided Nov. 1, 1994.
 Before BAUER, FLAUM and RIPPLE, Circuit Judges.
 
 ORDER
 
 1
 In this civil rights action, the estates of twelve persons who died in a tragic house fire in Milwaukee, Wisconsin alleged that the City and several of its officers discriminated against them in the enforcement of a City ordinance that required the placement of operable smoke detectors in homes. The district court granted summary judgment for the defendants. Baugh v. Milwaukee, 823 F.Supp. 1452 (E.D.Wis.1993). We affirm the judgment of the district court.
 
 1.
 
 2
 We begin by setting forth the basic provisions of the ordinance and the appellants' view of its operation and effect. The ordinance in question governs the placement of operable smoke detectors in residences within the City of Milwaukee. In the case of one-and two-family dwellings, the ordinance places the duty of installation on the occupants, not the owners. In larger, multifamily dwellings, the ordinance requires that the owners install the devices. The appellants note that most black residents of the City live in a section comprised mostly of one-and two-family dwellings. The City's multifamily districts are populated primarily by white residents. Therefore, in the view of the appellants, the requirement that tenants of one-and two-family homes install their own fire detectors burdens disproportionately the black residents.
 
 
 3
 The appellants continue that the City's enforcement policy was to advise residents of single-and two-family dwellings of the ordinance and to issue a warning when the dwelling did not contain an operable detector. This approach, the appellants contend, led to overworked inspectors overlooking the absence of a detector or failing to advise the occupant of the importance of the device. They also submit that more fires occur in the section of the City in which most black residents reside. From these facts, which in the view of the appellants amount to a disparate impact on black residents of the City, the appellants ask that we infer an intent to discriminate against black citizens.
 
 
 4
 Finally, the appellants submit that the district court erred when it failed to allow access to the personnel files of the City. The appellants believe that these files would establish that inspectors in neighborhoods in that area of the City with a substantial black population were not as experienced as those in other sections and, despite that inexperience, carried heavier caseloads.
 
 
 5
 We now examine the circumstances surrounding the tragic fire and loss of life. Although the ordinance does not require inspection of one-and two-family residences, an inspection was requested by the tenant of the house that later burned. The inspection was conducted as requested. The plaintiffs alleged in their complaint that the inspector failed to warn the tenant of the absence of a smoke detector and the requirement of the ordinance that one be installed. There is an issue of fact whether a detector was installed. It is also disputed whether a warning was given by the inspector. The inspector testified that, although she could not remember the particular instance, it was her regular practice to notify the tenant if a detector was not observed during the inspection.
 
 2.
 
 6
 In granting summary judgment in favor of the City, the district court held that the plaintiffs failed to establish that the City had a policy of discriminating against black residents with respect to the housing inspections. The parties agreed that, in addressing this allegation, the district court had to address three issues: (1) the existence of racially identifiable neighborhoods; (2) substantial inferiority in the quality of quantity of the municipal service; and (3) discriminatory intent or motive. Alexander v. Chicago Park Dist., 709 F.2d 463, 467-68 (7th Cir.1983). The parties recognized that proof of disproportionate impact, by itself, is insufficient to established an equal protection violation. Arlington Heights v. Metropolitan Hous. Dev. Corp., 429 U.S. 252, 264-65 (1977). At the outset of its analysis, the district court held that the plaintiffs were able to show that the City of Milwaukee contains racially identifiable neighborhoods.[1] The remaining two issues, however, posed more substantial problems for the appellants. They were not able to establish that there was substantial inferiority in the inspections rendered in predominantly black areas. Nor were they able to show that the City had operated the inspection program with a discriminatory intent. The district court discussed each of these deficiencies in the plaintiffs' case separately.
 
 
 7
 The district court turned first to the allegation of inferiority in the conduct of inspections. It determined that the statistical data submitted by the City established that the quantity of services rendered in those areas that have large numbers of black residents was higher than in other areas, whether that measurement was in terms of persons or in terms of households.[2] The court rejected the plaintiffs' argument that a genuine issue of triable fact existed because these figures had not been adjusted to take into account the fact that the areas with a large black population were areas in which the houses were older and in which, consequently, more inspections would naturally be required. In the district court's view, the statistical data merely showed that the City had in fact been responsive to the complaints received from those who lived in the black community.[3] With respect to the quality of those inspections, the court concluded that the record did not support the conclusion that the inspections in the black community were performed by less experienced inspectors who performed lower quality inspections. The court first noted that the plaintiffs had submitted no evidence to support the assertion that less experience on the part of the inspector could be equated with lower quality inspections. Nor did the plaintiffs establish that less experienced inspectors were in fact assigned to those areas with a large black population. Moreover, noted the district court, the data established that the inspections in the black community had resulted in a greater number of violations, a good indication that the inspectors had taken into account the condition of the buildings.
 
 
 8
 Turning to the issue of discriminatory intent, the district court concluded that the plaintiffs had not established any factual question with respect to the issue of discriminatory intent. The court noted that, in the case of one-and two-family dwellings, the inspection was initiated by the request of the tenant. To prove discriminatory intent, the plaintiffs were therefore required to show that the City treated requests from its black residents differently from its requests by white residents. There was no evidence of such disparate treatment. Indeed, the record demonstrated that, although more requests were received from areas that were identifiably black, more inspections also occurred there.
 
 
 9
 The court then addressed the allegation that the code enforcement policy was discriminatory because it did not call for the issuance of a citation against a tenant who had failed to equip a one-or two-family dwelling with a smoke detector. It was the policy of the City to counsel the non-complying tenant on the need for such a device in an effort to achieve voluntary compliance. The City proffered two reasons for the adoption of this approach. First, the minimum penalty for noncompliance was far more costly than the cost of a smoke detector. The City was of the view that, under these circumstances, the goal of the ordinance would be achieved far more quickly if the tenants were able to spend available funds for the purchase of the device rather than for the payment of a fine. Second, it was the experience of the City that the issuance of a citation usually resulted in a reluctance on the part of tenants to open their premises to reinspection without lengthy enforcement procedures. In the district court's view, the policy of the Department and the reasons given for the selection of that policy "were clearly rational." The district court noted that the plaintiffs' expert had testified that the policy would have a greater impact on the poor because they would have no impetus to install a detector. The court pointed out that this conclusory assertion was not supported by any factual data. However, at best, it was probative to show not racial discrimination, as alleged in the complaint, but economic discrimination.
 
 
 10
 Because this case was adjudicated on summary judgment, our review is de novo. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Robinson v. PPG Indus., Inc., 23 F.3d 1159, 1162 (7th Cir.1994). We review the record in a light most favorable to the plaintiffs. Nevertheless, if that record demonstrates that there are no genuine issues of material fact and that the defendants are entitled to judgment as a matter of law, we shall affirm the judgment of the district court. Anderson, 477 U.S. at 247; Sarsha v. Sears, Roebuck & Co., 3 F.3d 1035, 1038 (7th Cir.1993). "Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." Arlington Heights, 429 U.S. at 266. Therefore, just as the summary judgment standard "is applied with added rigor" in employment and age discrimination cases, "where intent is inevitably the central issue," Kralman v. Illinois Dep't of Veterans' Affairs, 23 F.3d 150, 152 (7th Cir.1994), petition for cert. filed, 63 U.S.L.W. 3161 (U.S. Aug. 26, 1994) (No. 94-354) (citing McCoy v. WGN Continental Broadcasting Co., 957 F.2d 368, 370 (7th Cir.1992)), it will be so applied in this race discrimination case. However, if the plaintiffs fail to present evidence from which a reasonable jury could find the requisite discriminatory intent, summary judgment is appropriate. Roger v. Yellow Freight Sys., Inc., 21 F.3d 146, 148 (7th Cir.1994) (citing Morgan v. Harris Trust & Sav. Bank, 867 F.2d 1023, 1026 (7th Cir.1989)).
 
 
 11
 Before us, the appellants make essentially the same arguments that were submitted previously to the district court. After studying the briefs and the record and hearing oral argument, we find ourselves in agreement with the district court both with respect to the appropriate disposition of the case and the reasons for that disposition. Applying the standards that we have just articulated, it is clear that there are no material issues of fact. Because the plaintiffs can point to no evidence that would permit a jury to find the requisite discriminatory intent, summary judgment was appropriate.
 
 3.
 
 12
 The appellants also challenge the ruling of the district court to deny them access to personnel records of the Department of Building Inspection. The Department maintains such records for a period of ten years and the appellants' request would therefore encompass about 200 records. The Department previously had produced the names of the inspectors employed from 1982 to 1987, payroll documents and all disciplinary documents pertaining to the inspector who had inspected the home that had burned. The Department, through the affidavits of it employees, informed the district court that the records contained no information with respect to the areas to which the inspectors had been assigned or to their workload. The records did contain information with respect to the training and performance evaluations of the inspectors.
 
 
 13
 Resolution of this discovery request was committed to the sound discretion of the district court. United States v. $94,000 in U.S. Currency, 2 F.3d 778, 786 (7th Cir.1993); Todd by Todd v. Merrell Dow Pharmaceuticals, Inc., 942 F.2d 1173, 1178 (7th Cir.1991). We cannot say that the district court's resolution of this matter was beyond the reasonable range of options from which the court might have been expected to choose. McGeshick v. Choucair, 9 F.3d 1229, 1236 (7th Cir.1993); United States v. Koen, 982 F.2d 1101, 1114 (7th Cir.1993). In the context of this litigation, the available data would have been of marginal, if any, relevance. There was no reversible error.
 
 Conclusion
 
 14
 For these reasons, we affirm the judgment of the district court.
 
 
 15
 AFFIRMED.
 
 
 
 [1]
 The district court concluded: "I think it safe--and sad--to say that Milwaukee is a highly segregated city." Baugh, 823 F.Supp. at 1461
 
 
 [2]
 The district court wrote:
 In regard to population, the white community was about 2.6 times the size of the black community under the 1985 census and approximately twice as large as the black community under the 1990 census. There were 3 to 4 times as many structures in the white community as in the black community. Yet, consistently between 1984 and 1988, more inspections were performed in the black community than in the white community. Far more citizen-complaint-generated inspections were performed in the black community as well during that time period. And, the number of violations cited in the black community--both total and per structure--was almost twice the number cited in the much-larger white community.
 Baugh, 823 F.Supp. at 1452 (footnotes omitted).
 
 
 [3]
 Continued the district court:
 The City's summarized data clearly shows that for only having 28/30.5 percent (1985 versus 1990) of the city population, for having 18.6/19.6/24.6 percent of the one-and two-family residences, and for only constituting the majority in 27.5/33 percent (1985 versus 1990) of the city's tracts, the black area received 53/56/58 percent of the one-and two-family dwelling inspection services. The fact that the citizens of that area requested and received more inspections helps the defendants' case, not the plaintiffs', because it shows that the code enforcement section did not ignore the black community but rather responded to its complaints.
 Baugh, 823 F.Supp. at 1463 (footnote omitted).